IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KT4 PARTNERS LLC, | § | |
| | § | No. 281, 2018 |
| Plaintiff Below, | § | |
| Appellant, | § | Court Below: Court of Chancery |
| | § | of the State of Delaware |
| v. | § | |
| | § | |
| PALANTIR TECHNOLOGIES INC., | § | C.A. No. 2017-0177-JRS |
| | § | |
| Defendant Below, | § | |
| Appellee. | § | |

Submitted: December 12, 2018
Decided: January 29, 2019

Before **STRINE**, Chief Justice; **SEITZ** and **TRAYNOR**, Justices.

Upon appeal from the Court of Chancery. **AFFIRMED** in part, **REVERSED** in part, and **REMANDED**.

Bartholomew J. Dalton, Esquire, Michael C. Dalton, Esquire, DALTON & ASSOCIATES, P.A., Wilmington, Delaware; Barry S. Simon, Esquire (*Argued*), Jonathan B. Pitt, Esquire, Stephen L. Wohlgemuth, Esquire, WILLIAMS & CONNOLLY LLP, Washington, District of Columbia, for Appellant, KT4 Partners LLC.

Blake Rohrbacher, Esquire, Kevin M. Gallagher, Esquire, Kelly L. Freund, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Kevin J. Orsini, Esquire (*Argued*), Rory A. Leraris, Esquire, CRAVATH, SWAINE & MOORE LLP, New York, New York, for Appellee, Palantir Technologies Inc.

**STRINE**, Chief Justice:

This appeal arises from a less-than-summary books and records action brought under Section 220 of the Delaware General Corporation Law. The stockholder and plaintiff below, KT4 Partners LLC, appeals from the Court of Chancery's post-trial order granting in part and denying in part KT4's request to inspect various books and records of appellee Palantir Technologies Inc., a privately held technology company based in Palo Alto, California.

After extensive motion practice and a one-day trial, the Court of Chancery found that KT4 had shown a proper purpose of investigating suspected wrongdoing in three areas: (1) "Palantir's serial failures to hold annual stockholder meetings"; (2) Palantir's amendments of its Investors' Rights Agreement in a way that "eviscerated KT4's (and other similarly situated stockholders') contractual information rights after KT4 sought to exercise those rights"; and (3) Palantir's potential violation of two stockholder agreements by failing to give stockholders notice and the opportunity to exercise their rights of first refusal, co-sale rights, and rights of first offer as to certain stock transactions.[1] The Court of Chancery therefore ordered Palantir to produce the company's stock ledger, its list of stockholders, information about the company's directors and officers, year-end audited financial statements, books and records relating to annual stockholder meetings, books and

---

[1] *KT4 Partners LLC v. Palantir Techs., Inc. (Palantir Opinion)*, 2018 WL 1023155, at *2, *13–14 (Del. Ch. Feb. 22, 2018).

records relating to any cofounder's sales of Palantir stock, each notice that Palantir sent to any "Major Investor" relating to certain offerings or sales of Palantir stock, and certain books and records relating to the Investors' Rights Agreement amendments.[2] The court otherwise denied KT4's requests, including its request to inspect emails related to the Investors' Rights Agreement amendments and its request for an exception to a jurisdictional use restriction that the court imposed.

The Court of Chancery dealt skillfully and expeditiously with the myriad issues dividing the parties in this contentious litigation, which is but one lawsuit among several between them. Consistent with their feisty relationship, the parties raise many issues on appeal. In our view, the Court of Chancery correctly applied the law and was within its discretion in resolving most of these issues, and we need not use many bytes addressing them.[3] But, as to two issues, we do conclude that the Court of Chancery erred.

---

[2] *KT4 Partners LLC v. Palantir Techs., Inc. (Palantir Final Order)*, 2018 WL 1411650, at *1–2 (Del. Ch. Mar. 20, 2018) (ORDER).

[3] In addition to the two arguments we address in depth, KT4 contends that the Court of Chancery erred by (1) "holding that the Demand did not state a valuation purpose"; and (2) "denying KT4's inspection of books and records necessary to investigate Palantir's misconduct under the Investors' Rights Agreement," namely "relating to the actual sales of stock that should have been offered to KT4." Opening Br. at 4, 6. We find no error as to either issue. As to the first, the Court of Chancery correctly concluded that KT4 stated only an "investigation of wrongdoing" purpose, not a valuation purpose. The plain language of the Demand described KT4's purpose as "to investigate fraud, mismanagement, abuse, and breach of fiduciary duty committed by the Corporation, its officers, its directors, its agents, and its majority shareholders." App. to Opening Br. at A-1648 (KT4 Partners LLC Books and Records Demand). As to the second, the Court of Chancery did not abuse its discretion in determining that the notices of stock transactions that Palantir sent to stockholders and records of the cofounders' actual sales would be enough for KT4 to investigate wrongdoing related to a potential denial of KT4's contractual rights to notice and participation in

2

We first hold that the Court of Chancery abused its discretion by denying wholesale KT4's request to inspect emails relating to the amendments of Palantir's Investors' Rights Agreement. Section 220 entitles a stockholder to inspect all books and records that are necessary to accomplish that stockholder's proper purpose, and on our review of the record below, KT4 made a sufficient showing that emails were necessary to investigate potential wrongdoing related to the Investors' Rights Agreement amendments. Given that discovery is limited in § 220 actions, KT4 discharged its evidentiary burden by presenting evidence that Palantir did not honor traditional corporate formalities (as suggested by its "serial failures to hold annual stockholder meetings"[4]) and had acted through email in connection with the same alleged wrongdoing that KT4 was seeking to investigate. Faced with that evidence, Palantir failed to present any evidence of its own that more traditional materials, such as board resolutions or minutes, even existed. And although the Court of Chancery may have credited Palantir's implicit suggestion that more formal books and records would be adequate for KT4's purposes, Palantir concedes on appeal that no such documents exist.

---

those transactions. If KT4's inspection revealed that Palantir failed to provide those notices (or selectively provided them to only some stockholders), KT4 would have a reasonable basis to plead breach of contract.

[4] *Palantir Opinion*, 2018 WL 1023155, at *2, *12.

Ultimately, if a company observes traditional formalities, such as documenting its actions through board minutes, resolutions, and official letters, it will likely be able to satisfy a § 220 petitioner's needs solely by producing those books and records. But if a company instead decides to conduct formal corporate business largely through informal electronic communications, it cannot use its own choice of medium to keep shareholders in the dark about the substantive information to which § 220 entitles them.

As to the second issue, we hold that the Court of Chancery abused its discretion by refusing KT4's modest requests to temper the jurisdictional use restriction the court imposed. At Palantir's request, the Court of Chancery imposed a broad restriction on the use of the materials KT4 was entitled to inspect, such that KT4 could not use them in litigation outside the Court of Chancery (except perhaps in another court located in Delaware, should the Court of Chancery decline jurisdiction). In imposing that limitation, the court rejected KT4's requests that it be allowed to bring suit: (1) in the first instance in the Superior Court, where other litigation between the parties was already pending; and (2) for any non-derivative action where one of Palantir's directors, officers, or agents is named as a defendant and that person would not consent to personal jurisdiction in Delaware, in a court located in another jurisdiction. Given that the court found a credible basis to investigate potential wrongdoing related to the violation of contracts executed in

4

California, governed by California law, and among parties living or based in California, the basis for limiting KT4's use in litigation of the inspection materials to Delaware and specifically the Court of Chancery was tenuous in the first place, and the court lacked reasonable grounds for denying the limited modifications that KT4 requested.

As this Court observed in *United Technologies Corp. v. Treppel*, the Court of Chancery must be cautious about limiting the jurisdictions in which a petitioner can use in litigation the books and records it receives from a § 220 action.[5] That is for an obvious reason: § 220 itself does not contain any statutory language restricting stockholders from using the books and records they inspect in lawsuits brought outside of Delaware. Accordingly, *Treppel* rested on the premise that restrictions of this kind are not routine and must be justified by "case-specific factors."[6] In that case, for example, the petitioner was limited to using the records in Delaware courts because, under the respondent corporation's bylaws, that was the only permissible forum in which the petitioner could bring suit, and because the other pertinent circumstances weighed toward restricting litigation use outside of Delaware. Here, the situation is quite different. The party seeking to impose the restriction, Palantir, had itself sued KT4 in California. And Palantir's bylaws did not contain a forum

---

[5] *See* 109 A.3d 553, 561 (Del. 2014) ("[C]aution is needed because use restrictions under § 220(c) have traditionally been tied to case-specific factors.").
[6] *Id.*

5

selection clause limiting suit to any particular jurisdiction. Not only that, but the two major stockholder agreements at issue in this case contained California choice of law clauses, which would give KT4 a rational basis for preferring that California courts resolve any disputes related to those contracts. Even in the face of those facts, KT4 did not contest being restricted to filing in Delaware in the first instance, but only asked for limited modifications that would allow it to file suit in the Delaware Superior Court in the first instance (instead of just the Court of Chancery) and in a court located in another jurisdiction if potential defendants do not consent to personal jurisdiction in Delaware.

We affirm in part and reverse in part the Court of Chancery's final order and judgment and remand for further proceedings consistent with this opinion.

## I. Background

### A. Facts[7]

#### i. KT4's Investments in Palantir and the Stockholder Agreements

Around 2003, KT4's principal, Marc Abramowitz, met with Palantir's CEO, Alex Karp, and KT4 made an initial $100,000 investment in Palantir. KT4 made several more investments in Palantir, ultimately reaching an estimated $60 million in value. For the next twelve years or so following KT4's initial investment,

---

[7] Unless otherwise noted, these facts are drawn from the Court of Chancery's post-trial opinion. *Palantir Opinion*, 2018 WL 1023155.

Abramowitz was "a trusted advisor to Palantir" with "unique access" to its executives.[8]

In connection with these investments, KT4, Palantir, and other stockholders entered the Investors' Rights Agreement in June 2006; the Amended Investors' Rights Agreement in February 2008; and, without KT4's involvement, the Amended and Restated Investors' Rights Agreement in July 2015. These agreements give "Major Investors" (including KT4) two rights central to this dispute. First, Major Investors get a "right of first offer" as to future stock offerings, which essentially requires Palantir to notify Major Investors whenever Palantir seeks to offer its stock and allows Major Investors an opportunity to buy stock in the offering.[9] Second, Major Investors get "Inspection" rights, which include not only the right to inspect books and records, but also the rights to inspect Palantir properties and discuss Palantir's business with its officers.[10]

Palantir and its investors, including KT4, also entered a First Refusal and Co-Sale Agreement (the "First Refusal Agreement").[11] The First Refusal Agreement gives Palantir a right of first refusal when specific investors try to sell their Palantir stock, and certain investors (including KT4) a co-sale right and right of first refusal

---

[8] *Id.* at *2.
[9] *Id.* at *3.
[10] *Id.* at *4 & n.29.
[11] Palantir and KT4 first entered the First Refusal Agreement in June 2006, and then an Amended and Restated First Refusal Agreement in February 2008. In July 2015, Palantir and certain other investors (excluding KT4) entered another Amended and Restated First Refusal Agreement.

second to Palantir's right of first refusal. In essence, these provisions give Palantir the first option to buy any or all of the block of shares that a selling investor tries to sell, and then qualifying investors get the option to buy their own pro rata portion of the shares within the block after Palantir.[12] Relevant to this appeal, the First Refusal Agreement also contains a choice of law clause providing that the Agreement "shall be interpreted under the laws of the State of California."[13]

ii. *The Falling Out and the Amendments to the Investors' Rights Agreement*

In the summer of 2015, Abramowitz's favored status ended after Palantir's CEO, Karp, accused Abramowitz of stealing Palantir's intellectual property. On that phone call, Karp "verbally abused" Abramowitz "in a manner that [Abramowitz] thought was irrational, somewhat unhinged, and completely contradictory to any relationship [he] had had with [Karp] in the past."[14] After the call, Abramowitz tried to sell KT4's stake in Palantir to a private equity fund, but the sale fell through. At trial, Abramowitz testified that the deal fell apart because Palantir had intentionally

---

[12] The First Refusal Agreement also provided for certain exemptions from these right of first offer and co-sale rights. The June 2006 and February 2008 versions of the First Refusal Agreement exempted the first 500,000 shares that an investor tries to sell from the right of first refusal and co-sale rights. The July 2015 version changed that provision to make the right of first refusal and co-sale rights inapplicable to transfers that are "approved by a disinterested majority of the Board" and do not exceed specified exemption levels. *Id.* at *5 (internal quotation marks omitted). Karp had zero shares exempted.

[13] App. to Opening Br. at A-1212 (Amended and Restated First Refusal and Co-Sale Agreement § 9).

[14] *Palantir Opinion*, 2018 WL 1023155, at *5 (internal quotation marks omitted) (some alterations in original).

8

thwarted the transaction, which is currently the subject of a tortious interference and civil conspiracy lawsuit brought by KT4 against Palantir and its broker in the Superior Court of Delaware.[15]

On August 16, 2016, after Abramowitz's attempt to sell KT4's Palantir position failed, KT4 sent Palantir an information request under the Investors' Rights Agreement. At that time, KT4 had enough Palantir stock to give it informational rights under the Investors' Rights Agreement as a Major Investor. Palantir wrote back five days later "stating that it was reviewing the request and would respond soon."[16]

But Palantir did not respond soon. Instead, on September 1, 2016, Palantir executed a new set of amendments to the Investors' Rights Agreement (the "September 2016 Amendments") and, on that same day, filed a lawsuit against KT4 in the Superior Court of California alleging, among other things, theft of Palantir's trade secrets.

The September 2016 Amendments reduced KT4's rights under the Investors' Rights Agreement in three key ways. First, they increased the Major Investor threshold from five million to ten million shares, which meant that KT4—which owned 5,696,977 shares—would no longer qualify for the right of first offer or have

---

[15] *KT4 Partners LLC v. Palantir Techs., Inc.*, 2018 WL 4033767 (Del. Super. Ct. Aug. 22, 2018) (denying the defendants' motions to dismiss).
[16] *Palantir Opinion*, 2018 WL 1023155, at *5.

inspection rights under the Investors' Rights Agreement. Second, they gave Palantir the right to deny an inspection request if Palantir and enough Major Investors consider the request to have been made in bad faith or for an improper purpose. Third, they gave Palantir the right to deny access to information it "reasonably considers to be a trade secret or similar confidential information."[17] These amendments purported to retroactively alter KT4's rights under the Investors' Rights Agreement, effectively mooting its August 16 informational request.

Summing up the circumstances surrounding the execution of the amendments, the Court of Chancery found that Palantir had "led KT4 to believe that it was considering KT4's information request, and then pulled the rug out from under KT4 (and other similarly situated stockholders) eleven days later by eviscerating its contractual right to seek information."[18]

Like the First Refusal Agreement, each amendment to the Investors' Rights Agreement also contains a choice of law clause providing for California law to govern the amendment: "This Amendment shall be governed by and construed under the laws of the State of California as applied to agreements among California

---

[17] *Id.* at *4 (internal quotation marks omitted).
[18] *Id.* *18.

10

residents entered into and to be performed entirely within California and without giving effect to principles of conflicts of law."[19]

### iii. KT4's § 220 Demand

On September 20, 2016, KT4 sent a written demand to Palantir requesting to inspect its books and records under 8 *Del. C.* § 220 (the "Demand"). As the Court of Chancery put it, the Demand's stated purpose was:

> "to investigate fraud, mismanagement, abuse, and breach of fiduciary duty committed by [Palantir], its officers, its directors, its agents, and its majority shareholders" relating to the following issues: (1) interference with KT4's efforts to sell its Palantir shares; (2) Palantir's practice of improperly favoring certain stockholders; (3) corporate waste; (4) Palantir's actions that deprived certain investors of the full value of their investments; (5) Palantir's actions that deprived certain investors of their [right of first refusal] to purchase Palantir shares and (6) securities fraud.[20]

The Demand requested general "access to the books and records of the Corporation (including hardcopy and electronic documents and information)," as well as twenty more specific requests, ranging from general information like financial statements to more specific information such as books and records related to the September 2016 Amendments and Palantir's potential breach of the First Refusal Agreement.[21]

---

[19] App. to Opening Br. at A-1588 (Amendment to the Amended and Restated Investors' Rights Agreement of Palantir Technologies Inc. § 3); *id.* at A-1605 (Amendment to the Amended and Restated Investors' Rights Agreement of Palantir Technologies Inc. § 3).
[20] *Palantir Opinion*, 2018 WL 1023155, at *6.
[21] App. to Opening Br. at A-1645–47 (KT4 Partners LLC Books and Records Demand).

About a week later, Palantir rejected the Demand. Over the following months, the parties tried to reach an agreement as to KT4's inspection rights, with Palantir offering KT4 in February 2017 its most recent financial statements and a capitalization table. But KT4 rejected that limited offer.

### B. Procedural History

On March 8, 2017, about half a year after sending the Demand to Palantir, KT4 brought this § 220 action in the Court of Chancery to compel Palantir to provide KT4 with access to the books and records requested in the Demand. Extensive motion practice, a one-day trial, and additional post-trial motion practice ensued.

On February 22, 2018, the Court of Chancery issued a post-trial opinion holding that KT4 had shown a proper purpose of investigating suspected wrongdoing in three areas: (1) "Palantir's serial failures to hold annual stockholder meetings"; (2) Palantir's amendment of its Investors' Rights Agreement in a way that "eviscerated KT4's (and other similarly situated stockholders') contractual information rights after KT4 sought to exercise those rights"; and (3) Palantir's potential violation of the Investors' Rights Agreement and the First Refusal Agreement by failing to give stockholders notice and the opportunity to exercise their rights of first refusal, co-sale rights, and rights of first offer as to certain stock transactions.[22] In so holding, the court rejected KT4's arguments that the Demand

---

[22] *Palantir Opinion*, 2018 WL 1023155, at *2, *13–14.

12

stated a valuation purpose and purposes of investigating wrongdoing related to Palantir's broker's compensation, interference with KT4's attempted stock sale to a private equity fund, a lack of liquidity to stockholders, and Palantir's CEO compensation.

In its opinion, the Court of Chancery also briefly addressed the scope of documents it would order produced. Overall, the court held that "KT4 is entitled to inspect books and records that are essential to fulfill" its three proper "investigative purposes."[23] The court also specifically held that KT4 was entitled to "*all books and records relating to*" the September 2016 Amendments.[24] The opinion did not place any explicit limits on scope related to those books and records. The opinion also required the parties to agree to a confidentiality agreement, but it did not place any other limitations on the use of the documents produced.

The parties thereafter conferred on an implementing final order, but they could not agree on certain issues, two of which are central to this appeal. First, KT4's proposed version of the final order provided that "'[b]ooks and records as used herein shall include electronically stored information ('ESI'), such as emails,"

---

[23] *Id.* at *17.
[24] *Id.* at *18 ("KT4 is entitled to book and records related to the September 2016 IRA Amendments as identified in Request 19."); App to Opening Br. at A-1647 (KT4 Partners LLC Books and Records Demand ¶ 19) (emphasis added) (requesting "all books and records relating to any amendment or purportedly retroactive amendment to the Investors' Rights Agreement made by Palantir or its shareholders on September 1, 2016").

13

whereas Palantir's version struck that provision.[25]  Second, Palantir's proposed order contained a jurisdictional use restriction requiring any lawsuit arising out of the inspection to be brought in the Delaware Court of Chancery, whereas KT4 proposed modifications of that restriction that would (1) allow suit to be brought in either the Court of Chancery *or* the Superior Court in the first instance; and (2) provide for the following exception related to personal jurisdiction (the "Personal Jurisdiction Exception"):

> Notwithstanding the foregoing, KT4 may bring any non-derivative suit arising out of the Inspection Information against any director, officer, or agent of the Company in any jurisdiction where such director, officer, or agent is subject to personal jurisdiction.  KT4 shall, however, provide the Company notice of such suit prior to filing.  If each and every director, officer, or agent of the Company to be named in such a suit submits to personal jurisdiction in Delaware in writing within five days of the Company's receiving notice, KT4 shall bring suit in a Delaware court.  If KT4 brings such a non-derivative suit in a jurisdiction outside of Delaware, it agrees to comply with that jurisdiction's procedures for obtaining confidential treatment to the extent it cites or attaches any Confidential Material to its complaint.[26]

That is, the Personal Jurisdiction Exception would allow KT4 to bring any non-derivative suit outside of Delaware when any Palantir officer, director, or agent who is named as a defendant does not consent to personal jurisdiction in Delaware, acting as a sort of safety valve in cases where personal jurisdiction over potential defendants in Delaware was uncertain.

---

[25] App to Opening Br. at A-3425 (Comparison of Proposed Final Orders and Judgments).
[26] *Id.* at A-3428.

14

On March 20, 2018, the Court of Chancery issued an implementing Final Order and Judgment ruling against KT4 on both of these issues.[27] As to the email issue, the parties read the Final Order to include a categorical exclusion of emails from the documents that Palantir would be required to produce.[28] Two days later, KT4 filed a motion for limited reargument as to that exclusion, particularly as to the September 2016 Amendments. On May 1, 2018, the Court of Chancery denied KT4's motion on two alternative grounds.[29] First, the court held that the Demand's request "for 'access to the books and records of the Corporation (including hardcopy and electronic documents and information)' cannot reasonably be viewed as a targeted request for electronic mail in these circumstances."[30] In reaching that conclusion, the court emphasized that the Demand had specifically requested emails as to another category of books and records, which the court viewed as showing that "KT4 was well aware of the distinction" between emails and electronic documents generally.[31] Second, the court held that "inspection of electronic mail is not essential

---

[27] *Palantir Final Order*, 2018 WL 1411650.

[28] The Final Order is not itself clear that it is excluding emails. *See id.* at *1 n.1 ("To the extent the books and records are maintained electronically, Palantir will produce such books and records in that format. Otherwise, 'books and records' as used herein shall not include electronically stored information."). But the court's later Order Denying Plaintiff's Motion for Limited Reargument makes clear that the court did intend for the Final Order to exclude emails. *KT4 Partners LLC v. Palantir Techs., Inc. (Palantir Order Denying Reargument)*, 2018 WL 2045831, at *1 (Del. Ch. May 1, 2018) (ORDER) ("[T]he Court issued a Final Order and Judgment, dated March 20, 2018, wherein the Court declined to include electronic mail within the Inspection Information . . . .").

[29] *Palantir Order Denying Reargument*, 2018 WL 2045831.

[30] *Id.* at *2.

[31] *Id.*

to fulfilling KT4's stated investigative purpose."[32]  The court did not explain why or how the non-email documents that Palantir was offering to provide would be sufficient to allow KT4 to fulfill its investigative purpose.  But the court did seem to assume that, under its Final Order, KT4 was entitled to receive "board level documents relating to Palantir's consideration of amendments to the Investors' Rights Agreement."[33]

As for the jurisdictional use provision, the Court of Chancery adopted Palantir's proposed version word for word (the "Jurisdictional Use Restriction"):

> Any claim, dispute, controversy, or cause of action between the Parties that arises out of the Inspection Information (including, for the avoidance of doubt, any derivative action) will be brought exclusively in the Court of Chancery of the State of Delaware, or, if this Court declines to exercise jurisdiction, any other state or federal court of competent jurisdiction located in the State of Delaware.[34]

The Court of Chancery did not explain its reasons for rejecting KT4's proposed modifications.

## II.     Analysis

### A. Issues on Appeal

On appeal, KT4 argues that the Court of Chancery erred by (1) "denying KT4's request to inspect emails relating to Palantir's conduct in amending the

---

[32] *Id.*

[33] *Id.*

[34] *Palantir Final Order*, 2018 WL 1411650, at *3.

Investors' Rights Agreement and violating KT4's contractual rights";[35] and (2) "imposing the Jurisdictional [Use Restriction]."[36]

### B. *Standard of Review*

In a § 220 action, we review for abuse of discretion the Court of Chancery's determination of both the scope of relief and any limitations or conditions on that relief.[37] This standard of review "is highly deferential."[38] "Undergirding this discretion is a recognition that the interests of the corporation must be harmonized with those of the inspecting stockholder."[39] Given "the breadth of this discretion, Delaware courts have viewed the determination of whether to impose a condition or limitation on an inspection as inherently case-by-case and 'fact specific.'"[40] Questions of law, however, "are reviewed *de novo*."[41]

As a threshold matter, although the parties generally agree that abuse of discretion is the appropriate standard of review, KT4 argues that *de novo* review applies to "[t]he issue of whether a Section 220 demand for 'all books and records' includes a particular type of book or record" because that issue "presents a question

---

[35] Opening Br. at 7.
[36] *Id.* at 5.
[37] *Wal–Mart Stores, Inc. v. Ind. Elec. Workers Pension Trust Fund IBEW*, 95 A.3d 1264, 1271–72 (Del. 2014).
[38] *Id.* at 1272.
[39] *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996).
[40] *United Techs. Corp. v. Treppel*, 109 A.3d 553, 558 (Del. 2014) (quoting *Espinoza v. Hewlett–Packard Co.*, 32 A.3d 365, 372 (Del. 2011)).
[41] *Wal–Mart*, 95 A.3d at 1272.

of law."[42] Palantir, by contrast, contends that the abuse of discretion standard applies to this issue.[43] This appears to be the first time that this Court has been asked to determine what standard of review applies to a dispute over the meaning of a § 220 demand.

We adopt a *de novo* standard of review as to which types of books and records are included in the actual written demand, except to the extent that the written demand is ambiguous and there are factual determinations underlying the Court of Chancery's resolution of that ambiguity. We have previously held that, in § 220 cases, abuse of discretion is the appropriate standard of review for the scope of relief and the limitations and conditions imposed on that relief,[44] whereas *de novo* review applies to questions of law, such as the applicability of attorney–client privilege[45] and whether a stated purpose is proper.[46] Interpreting a written demand is more analogous to contract interpretation, which is subject to *de novo* review as a question of law,[47] than to the sorts of fact-intensive, judgment-based determinations that are

---

[42] Opening Br. at 37.

[43] Answering Br. at 40 (framing one of the questions presented as whether "the Court of Chancery abused its discretion in finding that KT4 did not state a request for emails with specificity"). Palantir does not explicitly engage with KT4's argument that *de novo* review applies because the issue presents a question of law.

[44] *See Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 569 (Del. 1997); *Treppel*, 109 A.3d at 557–58.

[45] *See Wal–Mart*, 95 A.3d at 1272.

[46] *See Sec. First*, 687 A.2d at 567.

[47] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009) ("Questions concerning the interpretation of contracts are questions of law, which we review *de novo*.").

reviewed for abuse of discretion (*e.g.*, the appropriate scope of relief or limitations on relief).[48] Nevertheless, to the extent that factual determinations underlie the Court of Chancery's interpretation of an ambiguous written demand (*e.g.*, where the court evaluated a witness's credibility), then deference to those factual findings must be given.

## C. The Exclusion of Emails Related to the September 2016 Amendments

KT4 first argues that the Court of Chancery erred by denying its request to inspect emails related to the September 2016 Amendments to the Investors' Rights Agreement. Specifically, KT4 argues that the Court of Chancery erred by holding that (1) the Demand did not request emails; and (2) emails were not necessary for KT4's investigative purpose.[49] As to the first point, KT4 emphasizes that the Court of Chancery has previously held that the term "books and records" can include emails, and the case for including emails is especially strong "where, as here, the request makes explicit reference to electronic documents."[50] As to the second point, KT4 argues that board-level materials are not sufficient in this case given the evidence that Palantir does much of its business informally.[51] And in fact, Palantir

---

[48] *E.g.*, 8 *Del. C.* § 220(c) ("The Court may, in its discretion, prescribe any limitations or conditions with reference to the inspection, or award such other or further relief as the Court may deem just and proper.").
[49] Opening Br. at 38–41.
[50] *Id.* at 38.
[51] *Id.* at 40.

has conceded on appeal that other than the September 2016 Amendments themselves, responsive non-email documents do not exist.

We must first address whether, as a threshold matter, the Demand requested emails related to the September 2016 Amendments. The Court of Chancery held that the Demand does not request emails, reasoning that the Demand's reference to "electronic documents and information" did not identify emails clearly enough.[52] KT4 challenges this ruling on appeal, pointing to cases in which this Court and the Court of Chancery have held or implied that the term "books and records" includes emails and emphasizing that the Demand "makes explicit reference to electronic documents."[53] Palantir responds with an *expressio unius* argument, contending that

---

[52] *See Palantir Order Denying Reargument*, 2018 WL 2045831, at *2 ("Contrary to KT4's assertions, its request in the Demand's preamble for 'access to the books and records of the Corporation (including hardcopy and electronic documents and information)' cannot reasonably be viewed as a targeted request for electronic mail in these circumstances."). The trial court elaborated:

> Most corporate "books and records" are stored in electronic format, so a request to inspect "electronic documents and information" is most reasonably construed as an attempt to reach the company's books and records stored in that format. KT4 was well aware of the distinction when it made its Demand, as evidenced by its specific demand for "email" and "correspondence" in category 22 of the Demand (not at issue here) *in addition to* its more general demand for "electronic documents and information" in the preamble.

*Id.*
[53] Opening Br. at 38–39.

the express reference to email in one of the 22 specific requests for books and records means that the Demand requested emails only as to that one specific request.[54]

We agree with KT4 that the Demand requested emails. As previously noted, the Demand requested, in relevant part:

> the books and records of the Corporation (*including . . . electronic documents and information*), its stock ledger, and the list of shareholders . . . and, without limiting the foregoing, . . . the following materials (*again including . . . electronic documents and information*): . . . *all books and records* relating to any amendment or purportedly retroactive amendment to the Investors' Rights Agreement made by Palantir or its shareholders on September 1, 2016 . . . .[55]

That request is drafted expansively to cover seemingly anything in the general category of "books and records," which has long been understood to cover both official corporate records and less formal written communications.[56] In case the breadth of the Demand wasn't clear enough, the Demand expressly requests—both as part of the general request and as a preface to the specific requests—not only "hardcopy" documents, but also "electronic documents and information."[57] "Emails," of course, are a type of "electronic document."[58] As to the specific request

---

[54] Answering Br. at 41–42 ("KT4's argument that its general request for 'hardcopy and electronic documents and information' constitutes a request for emails is unavailing in the context of a Section 220 proceeding. . . . If anything, the express reference to emails in one Request suggest that KT4 was *not* seeking emails in other requests that did not specifically reference emails." (internal citations omitted)).

[55] App. to Opening Br. at A-1645–47 (KT4 Partners LLC Books and Records Demand).

[56] *See* sources cited *infra* note 75.

[57] App. to Opening Br. at A-1645 (KT4 Partners LLC Books and Records Demand).

[58] *E.g.*, *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 792 (Del. Ch. 2016) ("The scope of the production . . . will include email and other electronic documents, which count as corporate books

for documents related to the September 2016 Amendments, that request asks for "*all*

books and records,"[59] which is about as broad as one can get. In its opinion, the

Court of Chancery appeared to grant that request for "all books and records" in full.[60]

Palantir's *expressio unius* argument is unconvincing. Given how many

specific requests KT4 made—22 in total—the Demand's specific identification of

emails in just *one* request but not others does not provide a compelling reason to

override the apparent breadth of the Demand and the general understanding that the

term "books and records" is comprehensive.[61]

With that threshold issue resolved, we now turn to the core issue: whether the

Court of Chancery abused its discretion in ruling that emails were not necessary for

KT4's purpose of investigating potential wrongdoing related to the September 2016

Amendments.

Stockholders of Delaware corporations have "a qualified common law and

statutory right to inspect the corporation's books and records."[62] As a general matter,

---

and records."). *See also* 2 EDWARD P. WELCH ET AL., FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 220.04 (6th ed. 2018-3 supp.) ("Inspection rights also extend to emails and other electronically stored information.").

[59] App. to Opening Br. at A-1647 (KT4 Partners LLC Books and Records Demand ¶ 19) (emphasis added).

[60] *Palantir Opinion*, 2018 WL 1023155, at *18 ("KT4 is entitled to book and records related to the September 2016 IRA Amendments as identified in Request 19."); App to Opening Br. at A-1647 (KT4 Partners LLC Books and Records Demand ¶ 19) (requesting "all books and records relating to any amendment or purportedly retroactive amendment to the Investors' Rights Agreement made by Palantir or its shareholders on September 1, 2016").

[61] *See* sources cited *infra* note 75.

[62] *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 116 (Del. 2002).

22

an inspecting stockholder with a proper purpose "bears the burden of proving that each category of books and records is essential to accomplishment of the stockholder's articulated purpose for the inspection."[63] Books and records satisfy this standard "if they address the 'crux of the shareholder's purpose' and if that information 'is unavailable from another source.'"[64] That determination is "fact specific and will necessarily depend on the context in which the shareholder's inspection demand arises."[65] Keeping in mind that § 220 inspections are not tantamount to "comprehensive discovery,"[66] the Court of Chancery must tailor its order for inspection to cover only those books and records that are "essential and sufficient to the stockholder's stated purpose."[67] In other words, the court must give the petitioner everything that is "essential," but stop at what is "sufficient."[68] In other decisions, we have referred to the set of books and records that are essential

---

[63] *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996).

[64] *Wal–Mart Stores, Inc. v. Ind. Elec. Workers Pension Trust Fund IBEW*, 95 A.3d 1264, 1271 (Del. 2014) (quoting *Espinoza v. Hewlett–Packard Co.*, 32 A.3d 365, 371–72 (Del. 2011)).

[65] *Espinoza*, 32 A.3d at 372.

[66] *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 570 (Del. 1997) ("[Section 220 proceedings and Rule 34 discovery] are not the same and should not be confused. A Section 220 proceeding should result in an order circumscribed with rifled precision. Rule 34 production orders may often be broader in keeping with the scope of discovery under Court of Chancery Rule 26(b)."). *See generally* Stephen A. Radin, *The New Stage of Corporate Governance Litigation: Section 220 Demands—Reprise*, 28 CARDOZO L. REV. 1287, 1336–78 (2006).

[67] *Thomas & Betts*, 681 A.2d at 1035.

[68] *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 775 (Del. Ch. 2016) ("The order should permit access to books and records that are 'essential' for the plaintiff to achieve its purpose, but should stop at the quantum of information that the court deems 'sufficient.'" (quoting *Thomas & Betts*, 681 A.2d at 1035))

and sufficient as those that are "necessary."[69]  To wit, in *Saito v. McKesson HBOC, Inc.*, we wrote that a stockholder with a proper purpose "should be given access to all of the documents in the corporation's possession, custody or control, that are necessary to satisfy that proper purpose."[70]

The issue of whether emails are "necessary" to accomplish the stockholder's purpose has come up explicitly in the Court of Chancery on several occasions[71] and implicitly at least once in this Court.[72]  In general, these decisions reflect the

[69] *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 114–15 (Del. 2002); *see also Yahoo*, 132 A.3d at 787–88 ("Subtle connotations aside, the terms 'necessary' and 'essential' are functionally synonymous for purposes of Section 220." (quoting *Sanders v. Ohmite Hldgs., LLC*, 17 A.3d 1186, 1194 n.2 (Del. Ch. 2011))).

[70] *Saito*, 806 A.2d at 114–15.

[71] *See Mudrick Capital Mgmt., L.P. v. Globalstar, Inc.*, 2018 WL 3625680, at *9 (Del. Ch. July 30, 2018) (ordering the production of the CEO's, general counsel's, and two directors' emails); *In re UnitedHealth Grp., Inc. Section 220 Litig.*, 2018 WL 110849, at *9–10 (Del. Ch. Feb. 28, 2018), *aff'd sub nom*, 2018 WL 5309957 (Del. Oct. 26, 2018) (denying the petitioners' request for certain officer emails because they failed to show that the board-level and other materials that they would receive, which included some emails, would be insufficient); *Lavin v. West Corp.*, 2017 WL 6728702, at *14 (Del. Ch. Dec. 29, 2017) (granting inspection of various communications, including "emails, memoranda and notes"); *In re Plains All Am. Pipeline, L.P.*, 2017 WL 6016570, at *4–5 (Del. Ch. Aug. 8, 2017) (ORDER) (rejecting the petitioners' request for the CEO's emails "because board-level materials are sufficient for their stated purpose"); *Yahoo*, 132 A.3d at 791–93 (requiring the production of the CEO's emails); *In re Lululemon Athletic Inc. 200 Litig.*, 2015 WL 1957196, at *5–7 (Del. Ch. Apr. 30, 2015) (explaining why the court was ordering the company to produce some emails, but not non-employee directors' emails from their personal accounts); *Tanyous v. Happy Child World, Inc.* 2008 WL 2780357, at *7 n.50 (Del. Ch. July 17, 2008 (requiring the production of emails); *Deephaven Risk Arb Trading, Ltd. v. UnitedGlobalCom, Inc.*, 2005 WL 1713067, at *10 (Del. Ch. July 13, 2005) (requiring the production of "electronic communications"); *Dobler v. Montgomery Cellular Hldg. Co.*, 2001 WL 1334182, at *5–7 (Del. Ch. Oct. 19, 2001) (requiring the production of emails that "reflect the decision-making of" the corporation).

[72] *See Wal–Mart*, 95 A.3d at 1273 ("Wal–Mart's argument that officer-level documents are not 'necessary and essential' to one of IBEW's three proper purposes is not supported by the record."); *Ind. Elec. Workers Pension Trust Fund IBEW v. Wal–Mart Stores, Inc.*, 2013 WL 5636296, at *2 (Del. Ch. Oct. 15, 2013) (ORDER) (ordering the production of various officers' "Exchange Server

principle that the Court of Chancery should not order emails to be produced when other materials (*e.g.*, traditional board-level materials, such as minutes) would accomplish the petitioner's proper purpose,[73] but if non-email books and records are insufficient, then the court should order emails to be produced.[74] Indeed, it cannot be otherwise if the statutory purpose of § 220 is to have meaning in a fast-moving society where the forms in which corporate records are kept continually evolve. This understanding—that § 220 must be interpreted in light of companies' actual and evolving record-keeping and communication practices—is not novel. Rather, it follows from one earlier recognized at common law, before email became a dominant mode of written communication, when stockholders were granted the right to inspect a variety of corporate "papers," often including letters and memoranda

---

data," which would include emails, and the imaging of "company-issued Blackberry (or any other relevant) devices" where Exchange Server data was unavailable).

[73] *See, e.g.*, *Plains*, 2017 WL 6016570, at *4–5.

[74] *See, e.g.*, *Wal–Mart*, 95 A.3d at 1273; *Wal–Mart*, 2013 WL 5636296, at *2; *Yahoo!*, 132 A.3d at 791–93. *See also* 2 WELCH ET AL., *supra*, § 220.04 (2018-3 supp.) ("Inspection rights also extend to emails and other electronically stored information.").

among officers and directors.[75]  Today, emails and other electronic communications do much of the work of the paper correspondence of yore.[76]

[75] *See, e.g.*, *Nodana Petroleum Corp. v. State ex rel. Brennan*, 123 A.2d 243, 246–47 (Del. 1956) (affirming the trial court's order allowing inspection of "[a]ll of the books, records, papers and documents of [the corporation] which should or may pertain either directly or indirectly to any negotiations or transactions between [the corporation] and" two members of the company's board of directors); *Otis-Hidden Co. v. Scheirich*, 219 S.W. 191, 194 (Ky. 1920) (holding that the corporation must produce "correspondence" between the corporation's "nonresident president, who was the controlling stockholder, and the vice president and general manager, who had entire charge of the business"); *Pfirman v. Success Mining Co.*, 166 P. 216, 217 (Idaho 1917) (affirming the trial court's order permitting inspection of "the records, books, and papers in the office of the [corporation] of every kind and nature and description whatsoever," with limited exceptions); *Meyer v. Ford Indus., Inc.*, 538 P.2d 353, 541 (Or. 1975) (interpreting the statutory term "books and records of account" as covering "all records, contracts, papers and correspondence to which the common law right of inspection of a stockholder may properly apply"); *State ex rel. McClure v. Malleable Iron Range Co.*, 187 N.W. 646, 647–48 (Wis. 1922) ("The right of a stockholder to examine the records and books of account of a corporation extends to all papers, contracts, minute books, or other instruments from which he can derive any information which will enable him to better protect his interests and perform his duties."); *White v. Manter*, 84 A. 890, 890 (Me. 1912) ("The common law gave to stockholders the right to examine the books, records, and papers of the corporation, when the inspection was sought at proper times and for proper purposes."); *Bank of Heflin v. Miles*, 318 So.2d 697, 466 (Ala. 1975) ("[A]t common law the inspection right covered all the books and records of the corporation, including corporate documents, contracts and papers . . . ."); 5A FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 2239, Westlaw (last updated Sept. 2018) ("The right of the shareholder to inspect corporate books and records at common law extends to all the books, papers, records, federal reports, and other data of the corporation respecting assets, liabilities, contracts, operations and practices, including correspondence between the controlling officers relating to the internal affairs of the corporation."). *But cf. State ex rel. Jones v. Ralston Purina Co.*, 358 S.W.2d 772, 778 (Mo. 1962) (interpreting the statutory term "books and records of account" as excluding "confidential inter-office communications").

[76] *See Schattner v. Papa John's Int'l, Inc.*, 2019 WL 194634, at *16 (Del. Ch. Jan. 15, 2019) ("[R]egarding emails and text messages from personal accounts and devices[,] [t]he reality of today's world is that people communicate in many more ways than ever before . . . .  Although some methods of communication (*e.g.*, text messages) present greater challenges for collection and review than others, . . . the utility of Section 220 as a means of investigating mismanagement would be undermined if the court categorically were to rule out the need to produce communications in these formats."); *Tanyous*, 2008 WL 2780357, at *7 n.50 (including both emails and letters within the general category of "correspondence" to be produced in a § 220 action). *See generally* Francis G.X. Pileggi et al., *Inspecting Corporate "Books and Records" in a Digital World: The Role of Electronically Stored Information*, 37 DEL. J. CORP. L. 163, 165 (2012) ("The overwhelming majority of information today is created and stored electronically as e-mails, text messages, word processing documents, and web pages.  Information that historically

In its briefing below, KT4 argued that emails were necessary to accomplish its purpose because Palantir appeared to have chosen to conduct its corporate business informally over email and other electronic media instead of more traditional means, and because much of the potential wrongdoing appeared to have occurred over email.[77] As particular examples, KT4 pointed to a LinkedIn message in which Palantir's broker reached out to the private equity fund that KT4's principal, Abramowitz, was trying to get to buy KT4's stock in Palantir (allegedly as part of an effort by Palantir to scuttle that deal);[78] "an email from Palantir in which it misleadingly denies" its brokers role in the deal;[79] and an email from Palantir in which it led "KT4 to believe that it was considering KT4's information request" under the Investors' Rights Agreement, with this latter email being a focus of the Court of Chancery in its discussion of potential wrongdoing related to the September 2016 Amendments.[80]

---

would have been kept in 'hard copy' in a filing cabinet, now originates and largely remains in electronic format, perhaps never reduced to paper." (internal citations omitted)).

[77] *See* App. to Opening Br. at A-3350 (Post-Trial Reply Br.) ("Email and other electronic documents count as books and records. If Palantir chose to conduct Palantir business on those mediums, it must produce responsive documents. This principle is especially important here, where it appears that much of the potential wrongdoing occurred via email or other forms of electronic communication." (internal citations, quotation marks, and alterations omitted)); *id.* at A-3393 (Letter from KT4 Partners LLC to the Court of Chancery) ("Much of the potential wrongdoing here likely occurred over email. . . . If KT4 could not inspect those emails, its investigation . . . would be materially incomplete."); *id.* at A-3457–58 (Mot. for Limited Reargument).

[78] *Id.* at A-3350 (Post-Trial Reply Br.).

[79] *Id.*

[80] *Id.* at A-3458 (Mot. for Limited Reargument) (internal quotation marks omitted) ("Palantir's use of email to perpetrate its apparent misconduct is not a matter of mere speculation. The behavior

27

The crux of Palantir's argument in response was that KT4 had simply "not met its burden of proving that email communications are essential."[81] In making that argument, Palantir did not buttress its claims with any evidence that other materials would be sufficient to accomplish KT4's purpose. Instead, it argued that the production of emails in response to a § 220 demand "is the 'exception rather than the rule'—granted only where there is compelling evidence that emails are *necessary* to a proper purpose."[82]

In our view, KT4 made as strong of a showing that emails were necessary as can be reasonably expected of a petitioner in a summary § 220 proceeding. Books and records actions are not supposed to be sprawling, oxymoronic lawsuits with extensive discovery.[83] Rather, as the statutory text of § 220 itself reflects, the Court of Chancery is entitled to "summarily order" an inspection.[84] A petitioner like KT4 is therefore in no position to get discovery to determine how a company like Palantir conducts business and whether the books and records that address its needs come in

that this Court focused on—'lead[ing] KT4 to believe that it was considering KT4's information request'—occurred over email." (quoting *Palantir Opinion*, 2018 WL 1023155, at *13).

[81] *Id.* at A-3419 (Letter from Palantir Technologies Inc. to the Court of Chancery).

[82] *Id.* at A-3463–64 (Opp'n to Mot. for Limited Reargument).

[83] *Chammas v. NavLink, Inc.*, 2015 WL 5121095, at *1 (Del. Ch. Aug. 27, 2015) ("Extensive discovery can bog down a books and records action which is supposed to be handled on a summary schedule.").

[84] 8 *Del. C.* § 220(c); *see also* Randall S. Thomas, *Improving Shareholder Monitoring and Corporate Management by Expanding Statutory Access to Information*, 38 ARIZ. L. REV. 331, 346–47 & n.88 (1996) (noting that Chancellor Seitz had added language to the draft version of § 220 in 1965 to "mak[e] it clear that this type of case should be given expedited treatment in the court system," and that the final version "created a summary procedure, with expedited discovery on limited issues and a quick trial").

the form of hardcopy documents, electronic PDFs, emails, or some other medium.[85]

After all, the point of a summary § 220 action is to give the stockholder access to a discrete set of books and records that are necessary for its purpose—a set that is much less extensive than would likely be produced in discovery under the standards of Rule 26 in a plenary suit.[86] Contrary to Palantir's urging, § 220 does not require the petitioner to meet an unrealistic "compelling evidence" standard just to obtain that discrete set of documents. Instead, a petitioner meets her burden to prove necessity by identifying the categories of books and records she needs and presenting some evidence that those documents are indeed necessary.[87]

---

[85] *See State ex rel. Cochran v. Penn-Beaver Oil Co.*, 143 A. 257, 260 (Del. 1926) ("[T]he parties should agree, if possible, what books, records and papers contain the information sought, and the inspection and examination be confined to them. If there is no such agreement, then the peremptory writ of mandamus should be issued . . . commanding the defendant to suffer and permit the relator . . . to inspect and make copies of such of the books, papers, accounts and writings of the defendant mentioned in his petition, and only of such of them that under the direction of the said court are found essential and sufficient . . . ."); *State ex rel. De Julvecourt v. Pan-American Co.*, 61 A. 398, 400 (Del. Super. Ct. 1904), *aff'd*, 63 A. 391 (Del. 1906) ("It was manifestly impossible for the relator to tell or know what particular books or papers would furnish the information desired. He stated the object and purpose of the inspection, and what he wished to know, and it may well be more within the knowledge of the company than of himself what books and papers in is possession and control would disclose the information he required to effect his purpose.").

[86] *See Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1034–35 (Del. 1996) (affirming the trial court's grant of limited inspection for the petitioner's valuation purpose); *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 570 (Del. 1997) ("[Section 220 proceedings and Rule 34 discovery] are not the same and should not be confused. A Section 220 proceeding should result in an order circumscribed with rifled precision. Rule 34 production orders may often be broader in keeping with the scope of discovery under Court of Chancery Rule 26(b).").

[87] *See Thomas & Betts*, 681 A.2d at 1035 (placing the burden on the petitioner show necessity as to "each category of the books and records requested"); *cf. NavLink*, 2015 WL 5121095, at *1 ("Extensive discovery can bog down a books and records action which is supposed to be handled on a summary schedule. Moreover, discovery under Court of Chancery Rule 26 is not the

In this case, KT4 met that burden. In its post-trial opinion, the Court of Chancery held that KT4 sought books and records for the proper purpose of investigating "fraud, mismanagement, abuse, and breach of fiduciary duty," that there was a credible basis to suspect wrongdoing related to the September 2016 Amendments to the Investors' Rights Agreement, and that KT4 was therefore entitled to inspect "all books and records" related to those amendments.[88] To investigate that potential wrongdoing, KT4 needed to inspect books and records in two general categories: first, documents used by Palantir's board (or top management, as the case may be) in determining whether to adopt the amendments and evidencing the company's authorization of the amendments; and second, documents related to Palantir's solicitation of investor consents, including investors' responses to those solicitations. We say "as the case may be" for a reason: it is not clear that Palantir's board played the role one might expect it to play in developing, approving, and obtaining consents for the amendments. Instead, it may be that management was solely responsible for those actions. At any rate, in many

appropriate means of gaining access to the same books and records which are the objectives of an 8 *Del. C.* § 220 action.").

[88] *Palantir Opinion*, 2018 WL 1023155, at *10–13, *18 ("KT4 has established a credible basis to suspect wrongdoing to investigate the September 2016 IRA Amendments. Accordingly, KT4 is entitled to books and records related to the September 2016 IRA Amendments as identified in Request 19."); App to Opening Br. at A-1647 (KT4 Partners LLC Books and Records Demand ¶ 19) (requesting "all books and records relating to any amendment or purportedly retroactive amendment to the Investors' Rights Agreement made by Palantir or its shareholders on September 1, 2016").

companies, those documents might come in the form of board minutes, PowerPoint presentations or memoranda addressed to the board, board resolutions, official hardcopy letters from the company to investors, and other non-email documents. But here, the Court of Chancery found that Palantir has a history of not complying with required corporate formalities, such as the requirement that it hold annual stockholders' meetings.[89] KT4 also submitted evidence that Palantir had conducted other corporate business informally, including over email in connection with the September 2016 Amendments. Fairly read, KT4 argued that (1) it needed books and records related to how the September 2016 Amendments were authorized, who authorized them, and why they did so; and (2) if the books and records in those categories involved email, as seemed likely, then Palantir had to produce those documents. That was sufficient under the circumstances of this case.

Requiring anything more of KT4 would subvert the statutory scheme governing books and records inspections by forcing the petitioner to conduct extensive discovery over which books and records are available and which would be sufficient for its purposes. In effect, Palantir is asking KT4 to do the impossible: demonstrate that the corporation in fact acted only through electronic

---

[89] *See Palantir Opinion*, 2018 WL 1023155, at \*2, \*12 (finding that Palantir had exhibited "serial failures to hold annual stockholder meetings").

31

communications, even though the purpose of a books and records action is to get the very documentary record that would allow a stockholder to make that determination.

This does not leave a respondent corporation like Palantir defenseless and presumptively required to produce emails and other electronic communications. If a corporation has traditional, non-electronic documents sufficient to satisfy the petitioner's needs, the corporation should not have to produce electronic documents. But when a petitioner like KT4 reasonably identifies the documents it needs and provides a basis for the court to infer that those documents likely exist in the form of electronic mail, the respondent corporation cannot insist on a production order that excludes emails even if they are in fact the only responsive corporate documents that exist and are therefore by definition necessary. Instead, once the Court of Chancery has determined the subject matter that the inspection must address, the respondent must exercise good faith in agreeing to a final order that gives the petitioner the books and records she needs to accomplish the purposes that the Court of Chancery found proper.[90]

---

[90] *See Penn-Beaver Oil*, 143 A. at 260 ("[T]he parties should agree, if possible, what books, records and papers contain the information sought, and the inspection and examination be confined to them."); *Pan-American*, 61 A. at 400 ("It was manifestly impossible for the relator to tell or know what particular books or papers would furnish the information desired. He stated the object and purpose of the inspection, and what he wished to know, and it may well be more within the knowledge of the company than of himself what books and papers in [its] possession and control would disclose the information he required to effect his purpose.").

Put another way, part of the reason why this issue between two quite aggressive adversaries has become confusing is that they have spent more time arguing over the form of the books and records that had to be produced rather than the substantive nature of those books and records. The more relevant question is what documents were necessary to fulfill KT4's legitimate purpose (*e.g.*, the documents explaining the origins and purpose of the amendments, and the solicitations used to procure investor consents). In the settle-order process in a § 220 action, it may be that a focus on this question of substance, rather than form, would provide a more concrete basis for the parties to resolve their differences and, at the very least, better help the Court of Chancery to decide any final disputes. Ultimately, however, the court will be highly dependent on the respondent's good faith participation in the process, because the respondent is likely to be the only participant in the settle-order process with knowledge of which corporate records are relevant to the petitioner's proper purpose as determined by the court.

To that point, in reviewing the Court of Chancery's decision, we recognize that the court likely read Palantir's insistence that KT4 had not shown that emails were necessary as an implicit representation that Palantir would produce the kind of formal documents that likely would have existed had this case been filed in the

1980s.[91] That is, the trial court likely interpreted Palantir's position as implying that some other set of corporate documents would be produced to satisfy KT4's legitimate needs. But, as it turns out, Palantir simultaneously argued that all emails should be excluded while likely not possessing the records that are necessary to meet KT4's legitimate purpose under § 220—such as the communications explaining the origins, purposes, and need for the amendments, and those used to secure internal and investor approvals for the amendments—in non-email form. On appeal, by way of example, Palantir conceded at oral argument that "there are no board-level documents," though "there may very well be emails," and "[i]n terms of what we are producing in response to the actual order, it is solely the [Investors' Rights Agreement] amendment," with there being "no documents subject to the original order . . . that get into the rationale for why these changes [were made]."[92] In any event, even without the benefit of Palantir's concession on appeal, if the Vice Chancellor doubted that the production of emails was necessary for KT4's proper purposes, he could have ordered emails to be produced only if Palantir could not in

---

[91] *Compare Palantir Ordering Denying Reargument*, 2018 WL 2045831, at *2 ("[I]nspection of electronic mail is not essential to fulfilling KT4's stated investigative purpose . . . . Unsatisfied with board level documents relating to Palantir's consideration of amendments to the Investors' Rights Agreement, KT4 seeks broad plenary discovery into alleged representations Palantir made to its stockholders related to this contract. Again, full-blown fact discovery is not the point of a Section 220 inspection."), *with* App. to Opening Br. at A-3419–20 (Letter from Palantir to the Court of Chancery) (characterizing another Court of Chancery case as "denying email inspection where other materials were sufficient for the plaintiffs' investigative purpose").

[92] Oral Argument Video at 29:44–30:13.

good faith produce other documents sufficient to fairly address the proper subjects of the inspection. Instead, the court denied KT4's request for emails categorically.

At bottom, the Court of Chancery found that KT4 had legitimate reasons for wanting to know how and why Palantir made the September 2016 Amendments, which gutted KT4's rights under a key stockholder agreement. If the only documentary evidence of the board's and company's involvement in the amendments comes in the form of emails, then those emails must be produced. This is not a burden of KT4's making. If a respondent in a § 220 action conducts formal corporate business without documenting its actions in minutes and board resolutions or other formal means, but maintains its records of the key communications only in emails, the respondent has no one to blame but itself for making the production of those emails necessary. And of course, if a company has no documents at all, email or otherwise, that show why and how its board or management authorized a key contractual amendment, that itself is information a § 220 petitioner can use, as it forms the basis for fact pleading that the amendment was not properly authorized.

We hold that the Demand requested emails related to the September 2016 Amendments and that the Court of Chancery abused its discretion in concluding that those emails were not necessary for KT4's purpose of investigating potential wrongdoing related to the amendments. We therefore reverse the Court of

35

Chancery's judgment in part and remand for the Court of Chancery to determine in the first instance the scope of emails that Palantir must produce.

### D. The Jurisdictional Use Restriction

The second major issue on appeal is whether the Court of Chancery abused its discretion by adopting the Jurisdictional Use Restriction without allowing KT4 to bring suit in the Delaware Superior Court in the first instance and without KT4's proposed Personal Jurisdiction Exception.

To understand why we resolve these issues as we do, some context about § 220 and the relatively recent emergence of jurisdictional use restrictions is necessary. Section 220 is a statute that gives stockholders with a proper purpose a right to inspect the corporation's books and records.[93] One of the most traditional proper purposes for a § 220 demand is the investigation of possible wrongdoing by management.[94] When a stockholder has made a colorable showing of potential wrongdoing, inspecting the company's books and records can help the stockholder to ferret out whether that wrongdoing is real and then possibly file a lawsuit if appropriate.[95] Nothing in § 220's text or our case law has ever suggested that the only possible place a stockholder can sue using those books and records is the

---

[93] 8 *Del. C.* § 220(b).

[94] *See, e.g.*, *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 567 (Del. 1997) ("It is well established that investigation of mismanagement is a proper purpose for a Section 220 books and records inspection.").

[95] *See Rales v. Blasband*, 634 A.2d 927, 934 n.10 (Del. 1993) (suggesting the value of § 220 as a possible "information-gathering tool in the derivative context").

Delaware Court of Chancery. And as a matter of legal and factual reality, stockholders of Delaware corporations can bring actions against the fiduciaries of those corporations in the courts of other jurisdictions if those courts can obtain personal jurisdiction over the defendants.

In fact, it was that reality and the wave of forum shopping by plaintiffs' counsel in third-party, non-conflicted mergers and acquisitions governed by *Revlon*[96] (*i.e.*, non-*Revlon*, *Revlon* suits[97]) in this century that prompted many corporations to adopt forum selection clauses limiting internal affairs claims to the Delaware Court of Chancery.[98] It was in this context that that this Court first held

---

[96] *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (1986).

[97] Unlike in *Revlon*, where the board had resisted selling (and especially selling to a specific bidder), *see id.* at 176–79, the fact scenario in these multiforum cases typically involved boards actively selling the corporation and seeking out buyers. The plaintiffs in these cases did not in reality seek relief for the class or to stop the deal. Instead, they used the costs and uncertainty of having suits in several forums at once to extract "disclosure-only" settlements resulting in the class getting the same economic deal supposedly being challenged, but with extra disclosures. Although these disclosures typically provided the class with nothing of substance, the plaintiffs' lawyers got a fee and the defendants a release from further exposure. *See In re Trulia, Inc. Stockholder Litig.*, 129 A.3d 884, 891–96 (Del. Ch. 2016) (explaining this dynamic); Jill E. Fisch, Sean J. Griffith & Steven Davidoff Solomon, *Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform*, 93 TEX. L. REV. 557, 581–85 (2015) (presenting empirical evidence on disclosure-only settlements and characterizing that evidence as "suggest[ing] that shareholders may not value the additional information from these disclosures at least in a way that affects their vote"); Matthew D. Cain & Steven Davidoff Solomon, Takeover Litigation in 2015, at 2–6 (Jan. 16, 2016) (unpublished manuscript), https://ssrn.com/abstract=2715890 (cataloging the increase of disclosure-only settlements from 2005 through 2015). Forum selection clauses emerged to address this unsavory scenario, as did the Court of Chancery's important decisions in cases like *Trulia*.

[98] *See generally Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 943–44 (Del. Ch. 2013) (describing the defendants' arguments "that they have adopted forum selection bylaws in response to corporations being subject to litigation over a single transaction or a board decision in more than one forum simultaneously, so-called 'multiforum litigation'"); Matthew D. Cain et al., *The Shifting Tides of Merger Litigation*, 71 VAND. L. REV. 603, 617–18, 631–32 (2018)

that the Court of Chancery has the authority to impose jurisdictional use restrictions in § 220 actions four years ago in *United Technologies Corp. v. Treppel*.[99]

In *Treppel*, the respondent corporation had a forum selection clause limiting internal affairs claims to the Court of Chancery, and the company had already been subject to derivative litigation in that court over the wrongdoing that the § 220 petitioner was seeking to investigate.[100]  In light of those circumstances, the corporation requested that the Court of Chancery use its discretion under § 220(c)[101] to limit the petitioner's use of the inspection materials in litigation to cases brought in the Court of Chancery.[102]  But the Court of Chancery concluded that it lacked the authority to impose such a limitation.[103]

On appeal, this Court reversed the Court of Chancery's determination that it lacked that authority and remanded the case for the Court of Chancery to determine in the first instance whether a jurisdictional use restriction would be appropriate

---

(explaining forum selection clauses as a response to multijurisdictional merger litigation).  In *Chevron*, the boards of the defendant corporations had characterized the purpose of their forum selection bylaws as "to minimize or eliminate the risk of what they view as wasteful duplicative litigation," which "imposes high costs on the corporations and hurts investors by causing needless costs that are ultimately born by stockholders." *Chevron*, 73 A.3d at 944.

[99] 109 A.3d 553 (2014).  *See* DONALD J. WOLFE & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 9.07 n.408 (2d ed. 2018) (characterizing *Treppel* as being concerned with the "corporation's 'legitimate concern' of being burdened by duplicative, multi-forum litigation" (quoting *Treppel*, 109 A.3d at 560–62)).

[100] *Treppel*, 109 A.3d at 555–56.

[101] 8 *Del. C.* § 220(c) ("The Court may, in its discretion, prescribe any limitations or conditions with reference to the inspection, or award such other or further relief as the Court may deem just and proper.").

[102] *Treppel*, 109 A.3d at 556.

[103] *Id.* at 557.

under the fact-specific circumstances of that case.[104] To guide the Court of Chancery on remand, we cited four factors that, in that particular case, the court would be entitled to give weight:

> (i) the fact that [the stockholder seeking inspection] seeks to file claims arising out of the same corporate conduct that was already the subject of derivative litigation in the Court of Chancery and this Court; (ii) [the corporation's] legitimate interest in having consistent rulings on related issues of Delaware law, and having those rulings made by the courts of this state; (iii) [the corporation's] adoption of a forum selection bylaw that represents a non-case-specific determination by its board of directors that internal affairs litigation involving the company should proceed in a single forum; and (iv) the investment the corporation has already made (which comes at a cost to its stockholders) in defending not only the prior derivative litigation in the Court of Chancery, but also this § 220 action.[105]

We reasoned that those factors could reasonably support the imposition of a jurisdictional use restriction "because they involve a legitimate concern on [the corporation's] part that it and its stockholders could face excessive costs and the risk of inconsistent rulings if [the petitioner] were to file suit elsewhere."[106]  We also emphasized, however, that "caution is needed because use restrictions under § 220(c) have traditionally been tied to case-specific factors."[107]

---

[104] *Id.* at 559, 562.

[105] *Id.* at 560.

[106] *Id.*

[107] *Id.* at 561; *see also* 2 WELCH ET AL., *supra*, § 220.04 (2018-2 supp.) ("Delaware courts view the determination of whether to impose a condition or limitation on an inspection on a 'case-by-case' and 'fact specific' basis in an effort 'to protect the legitimate interests of Delaware corporations.'" (quoting *Treppel*, 109 A.3d at 558–59)).

To our knowledge, *Treppel*—a case decided just a few years ago—was the first time there was litigation over a jurisdictional use restriction in a § 220 action.[108] In other words, despite the long history of litigation under § 220, the imposition of jurisdictional use restrictions was a new phenomenon, and not at all a common condition to be routinely imposed. *Treppel* itself signaled as much.

But, in this case, Palantir acted as if it was to be expected that any relief for KT4 would be conditioned on a jurisdictional use restriction in Palantir's favor. Thus, when Palantir urged the trial court to adopt a broad jurisdictional use restriction limiting suit arising out of KT4's inspection to the Delaware Court of Chancery, it argued that "[j]urisdictional provisions mandating that suits arising out of Section 220 proceedings must be brought in Delaware courts *are the norm* in the Court of Chancery, and there is no reason to deviate *from that norm here*."[109] And KT4 itself largely accepted this proposition below by saying it would accept a final judgment that would limit suit to courts located in Delaware, subject only to having the right to bring suit in (1) either the Court of Chancery *or* the Superior Court and (2) another jurisdiction if any director, officer, or agent of Palantir who is named as

---

[108] In their extensive discussions of § 220, the key Delaware treatises cite no example of a case addressing a jurisdictional use restriction before *Treppel*, or any example of the Court of Chancery imposing such a restriction before then. *See* 1 R. FRANKLIN BALOTTI & JESSE A. FINKELSTEIN, DELAWARE LAW OF CORPORATIONS & BUSINESS ORGANIZATIONS § 7.47 (3d ed. 2019-1 supp.); 2 WELCH ET AL., *supra*, § 220.04; WOLFE & PITTENGER, *supra*, § 9.07[j].

[109] App. to Opening Br. at A-3422 (Letter from Palantir to the Court of Chancery) (emphasis added).

a defendant does not consent to personal jurisdiction in Delaware (the "Personal Jurisdiction Exception").

Without explaining its reasons, the Court of Chancery ruled against KT4 on both counts. As to the first issue, the court limited suit between the parties arising out of the inspection to the Court of Chancery exclusively, except in cases where the Court of Chancery declines jurisdiction, in which case suit could be brought in another state or federal court located in Delaware. As to the personal jurisdiction issue, the court denied KT4's request for a carve-out that would allow it to bring suit in other jurisdictions under limited circumstances, opting instead to simply limit suit to Delaware.

On appeal, KT4 takes issue with both rulings, arguing that the Jurisdictional Use Restriction is unreasonable under the circumstances of this case. In particular, KT4 emphasizes that one of its investigative purposes was to assess whether Palantir and its cofounders had breached the Investors' Rights Agreement or First Refusal Agreement, which are contractual claims that it should be able to bring outside the Court of Chancery, and that many of the necessary parties to any breach of contract action based on these agreements (*e.g.*, Karp and other Palantir cofounders) are California residents who may not be subject to personal jurisdiction in Delaware.[110]

---

[110] Opening Br. at 30–31; Reply Br. at 15–18.

KT4 also contends that the Court of Chancery failed to analyze any of the "case-specific factors" mentioned in *Treppel* (or indeed, any case-specific factors at all).[111]

For its part, Palantir offers a more tepid form of its robust argument below in favor of the restriction it sought. At oral argument, Palantir backed away from its statement to the court below that jurisdictional use restrictions were the norm in the Court of Chancery.[112] Instead, Palantir contends that any claim arising out of KT4's investigation "would have to be brought against the Founders in their capacity as fiduciaries," and that KT4 has not explained why that would not be possible in the Delaware Court of Chancery.[113] To justify the imposition of the Jurisdictional Use Restriction more generally, Palantir cites two factors: first, Delaware's "expertise in corporate law"; and second, the possibility that Palantir and its stockholders might "face excessive costs and the risk of inconsistent rulings" if similar lawsuits were litigated elsewhere.[114] Palantir does not, however, identify any investors other than KT4 who have threatened suit.

As we have noted, § 220 provides no textual basis for the imposition of jurisdictional use restrictions as the "norm." And *Treppel*, which remains the only case in which this Court has addressed the circumstances under which a

---

[111] Opening Br. at 30.
[112] *See* Oral Argument Video at 32:17–19 ("I don't think anyone had said it was a norm."). In reality, Palantir did make that statement, but it is correct that there is and should be no norm to that effect until the General Assembly amends § 220 to impose that norm through legislation.
[113] Answering Br. at 33.
[114] *Id.* at 31 (quoting *Treppel*, 109 A.3d at 560) (internal quotation marks omitted).

jurisdictional use restriction may be imposed, involves facts that, by their contrast with this case, illustrate the problematic nature of the Court of Chancery's assent to Palantir's aggressively sought restriction.

In *Treppel*, the corporation subject to the books and records request had in place a forum selection clause.[115] When the petitioner in the § 220 action sought books and records, likely with the ultimate goal of bringing a derivative action alleging breach of fiduciary duties under Delaware law, the respondent corporation logically argued that the Court of Chancery was entitled to take into account the corporation's governing instruments and limit lawsuits using the inspection materials to a forum consistent with those governing instruments.[116] Further supporting the case for a restriction, the respondent corporation had already been sued in derivative litigation in Delaware over the same alleged wrongdoing that the petitioner was seeking to investigate. Underscoring the importance of not reading into § 220 a sweeping restriction on stockholder rights not found in its text, this Court reversed the Court of Chancery's determination that it lacked the authority to impose a jurisdictional use restriction, but did so cautiously even in a situation when the company's request for the restriction was amply supported by its bylaws and the circumstances of the petitioner's demand.

---

[115] *Treppel*, 109 A.3d at 560.
[116] *See id.*

The case-specific factors that are relevant in this case, by contrast, cut strongly against the imposition of a jurisdictional use restriction. For starters, Palantir has no forum selection clause limiting investors like KT4 to bringing suit in the Delaware Court of Chancery, or even more generally courts in Delaware (state or federal).[117] Second, the efficiency rationale for imposing a jurisdictional use restriction is much weaker here than in *Treppel*. Unlike the corporation in *Treppel*, Palantir is a private company with a discrete set of investors and is therefore less likely than a public company to face the potential for multiforum class or derivative actions, and there was no prior litigation against it in Delaware related to the purposes that the Court of Chancery found proper.[118] And although Palantir has adverted to the possibility of inconsistent judgments, it has not pointed to any plausible plaintiff who might be in a similar situation to KT4. In fact, Palantir's proposed jurisdictional use restriction had the unusual effect of *expanding* the judicial forums in which it and KT4 are fighting. After all, the first litigation between the parties was brought by Palantir itself in the California Superior Court, and the second plenary litigation (putting aside this summary § 220 action) was brought by KT4 in the Delaware Superior Court. But, instead of channeling the use of the books and records obtained

---

[117] *See* App. to Opening Br. at A-2332–47 (Bylaws of Palantir Technologies Inc.).

[118] Although KT4 filed a tortious interference lawsuit against Palantir in the Superior Court of Delaware, that lawsuit related to one of the purposes that the Court of Chancery expressly found improper (investigating wrongful interference with Abramowitz's attempts to sell KT4's stock). *See Palantir Opinion*, 2018 WL 1023155, at *16.

44

by KT4 into one of those two existing forums in which the parties have been fighting, Palantir sought a jurisdictional use restriction that requires KT4 to file suit exclusively in the Delaware Court of Chancery, with the end result being three different judges in three different courts will simultaneously handle litigation between the parties.

Put simply, unlike in *Treppel*, where the jurisdictional use restriction promoted the efficiency-oriented goals of the corporation's forum selection clause and preventing multiple forums from addressing related disputes, the Jurisdictional Use Restriction in this case expands the number of forums in which these fierce adversaries would simultaneously litigate over issues where there was likely to be overlapping documentary discovery and witness testimony.

Just as important, the corporation's interest in this case in having Delaware courts address issues of Delaware law is weak compared to *Treppel*. In *Treppel*, the petitioner sought books and records to bring claims for wrongdoing under Delaware corporate law, and the respondent corporation sought, consistent with its forum selection clause, to limit the use of those books and records to lawsuits brought in the Delaware Court of Chancery. In this case, by contrast, California is central to some of the possible claims that KT4 seeks to investigate by inspecting Palantir's books and records. The Court of Chancery explicitly described KT4's third proper

45

purpose in terms of "alleged violations of its stockholder agreements,"[119] and both of those agreements (the Investors' Rights Agreement and the First Refusal Agreement) include choice of law clauses providing for California law. Even as to the second proper purpose (investigating suspected wrongdoing related to the September 2016 Amendments), potential claims by KT4 could include not only fiduciary duty claims related to those actions, but also contractual claims based on the implied covenant of good faith and fair dealing, which may turn out differently under California law than they would under Delaware law.[120] For these reasons, KT4 would have a rational basis for preferring that a California court address issues of California law.

Although KT4 agreed—as these circumstances did not require it to do—to a final judgment that limited its ability to file suit outside of Delaware, KT4 only asked the trial court to temper that restriction in two ways that had a rational basis. The first change merely sought to ensure that KT4 could file a claim in the Superior Court of Delaware, where it could get a jury trial and where it already had a pending lawsuit against Palantir, because some of its claims would be for breach of contract. These

---

[119] *Id.* at *18.

[120] *Compare Cal. Lettuce Growers v. Union Sugar Co.*, 289 P.2d 785, 791 (Cal. 1955) ("[W]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing."), *with Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 411 (Del. 2005) ("The covenant is best understood as a way of implying terms in the agreement . . . . [I]mplied good faith cannot be used to . . . create a free-floating duty . . . ." (internal quotation marks omitted)).

46

are sensible reasons, devoid of any impropriety. But, for reasons it did not explain, the Court of Chancery denied KT4 this right. Although we understand the Court of Chancery's desire to limit possible forum shopping by KT4, we fail to understand the contextual, much less statutory, basis on which Palantir is entitled to condition its production of books and records on a requirement that KT4 file any resulting lawsuit in our Court of Chancery rather than our Superior Court.

Even more important, KT4 asked for a reasonable safeguard intended to allow it to proceed in other jurisdictions, such as California, in the event that key individuals do not consent to personal jurisdiction in Delaware. That is, KT4 wanted to try in Delaware first, but with a safety valve in case personal jurisdiction over certain potential defendants might be lacking in Delaware. Allowing KT4 to proceed elsewhere, but only if any of Palantir's officers, directors, or agents who are named as defendants do not consent to personal jurisdiction in Delaware, is a reasonable solution to this problem.

Given the nature of KT4's potential claims, KT4 might plausibly need to join some of Palantir's officers, directors, or agents as defendants in a lawsuit arising out of the inspection information to accomplish some of the purposes that the Court of Chancery found proper. In particular, two of Palantir's cofounders—Karp (who is also the CEO) and Peter Thiel—stand out as potential defendants. Karp has been a central figure in this dispute, both in his capacity Palantir's CEO and as a major

47

Palantir stockholder who was a signatory to the Investors' Rights Agreement and the First Refusal Agreement.[121]  As for Thiel, his role in the dispute is less clear, but he did sign the Investors' Rights Agreement and the First Refusal Agreement, including the September 2016 Amendments, both on his own behalf and on behalf of numerous entities.[122]  This leaves open the possibility that Thiel may have also played a substantial role in the events at issue, including the September 2016 Amendments and any breach of the Investors' Rights Agreement or First Refusal Agreement.  The potential that these defendants would not be subject to personal jurisdiction in Delaware, even if remote, reasonably supports KT4's request for a safety valve.  And if Delaware courts *will* be able to assert personal jurisdiction over the defendants, then granting KT4's requested Personal Jurisdiction Exception cannot prejudice Palantir.

Given the reality that the key contracts at issue are all governed by California law and that Palantir itself had sued in California, KT4 was, in our view, generous

---

[121] *See* App. to Opening Br. at A-1215, A-1224, A-1273 (Signature Pages to Amended and Restated First Refusal and Co-Sale Agreement for Palantir Technologies Inc.); *id.* at A-1309, A-1356 (Signature Pages to the Amended and Restated Investors' Rights Agreement for Palantir Technologies Inc.); *id.* at A-1589 (Signature Page to the Amendment to the Amended and Restated Investors' Rights Agreement of Palantir Technologies Inc.); *id.* at A-1606 (Signature Page to the Amendment to the Amended and Restated Investors' Rights Agreement of Palantir Technologies Inc.); *id.* at A-2284 (Stockholder List) (listing Karp as owning about 40 million shares).

[122] *Id.* at A-1218–23 (Signature Pages to Amended and Restated First Refusal and Co-Sale Agreement for Palantir Technologies Inc.); *id.* at A-1312–17 (Signature Pages to the Amended and Restated Investors' Rights Agreement for Palantir Technologies Inc.); *id.* at A-1591–96 (Signature Pages to the Amendment to the Amended and Restated Investors' Rights Agreement of Palantir Technologies Inc.); *id.* at A-1608–13 (Signature Pages to the Amendment to the Amended and Restated Investors' Rights Agreement of Palantir Technologies Inc.).

in conceding as much as it did. We cannot discern a reasonable basis for denying KT4's modest request for a safety valve in cases where potential defendants would not consent to personal jurisdiction in Delaware.

For all these reasons, we hold that the Court of Chancery abused its discretion by imposing the Jurisdictional Use Restriction without allowing KT4 to bring suit in the Delaware Superior Court in the first instance and without KT4's proposed Personal Jurisdiction Exception. We therefore reverse to the extent that the Final Order and Judgment denies KT4 the right to bring an action in the Superior Court in the first instance and omits the Personal Jurisdiction Exception.

## III. Conclusion

The Court of Chancery abused its discretion both by excluding emails related to the September 2016 Amendments from the scope of relief and by imposing the Jurisdictional Use Restriction without KT4's requested modifications. As to the other two issues raised by KT4, we find no error. We therefore affirm in part and reverse in part the Court of Chancery's judgment and remand for further proceedings consistent with this opinion.

49