# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

OKLAHOMA FIREFIGHTERS )
PENSION AND RETIREMENT )
SYSTEM, )
 )
   Plaintiff, )
 )
   v. ) C.A. No. 2021-0484-LWW
 )
AMAZON.COM, INC., )
 )
   Defendant. )

## MEMORANDUM OPINION

Date Submitted: April 7, 2022
Date Decided: June 1, 2022

Blake A. Bennet, COOCH AND TAYLOR , P.A., Wilmington, Delaware; Geoffrey M. Johnson, SCOTT+SCOTT ATTORNEYS AT LAW LLP, Cleveland Heights, Ohio; Donald A. Broggi & Scott R. Jacobsen, SCOTT+SCOTT ATTORNEYS AT LAW LLP, New York, New York; *Counsel for Plaintiff Oklahoma Firefighters Pension and Retirement System*

Kevin R. Shannon, Berton W. Ashman, Jr., & Mathew A. Golden, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; William Savitt, Anitha Reddy, Adam M. Gogolak, Corey J. Banks, & Zachary M. David, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; *Counsel for Defendant Amazon.com, Inc.*

**WILL, Vice Chancellor**

This matter concerns a demand brought pursuant to Section 220 of the Delaware General Corporation Law to inspect books and records of Amazon.com, Inc. The plaintiff seeks to investigate possible mismanagement by Amazon's directors and officers in connection with the company's compliance with certain antitrust and tax laws.

Amazon, while questioning whether the plaintiff had demonstrated a proper purpose, wisely attempted to resolve the dispute by producing board-level documents. After the plaintiff pressed for more materials, Amazon made a second production. The plaintiff filed this litigation, seeking a wide array of documents, rather than attempt to negotiate further.

With respect to antitrust compliance, the plaintiff's demand letter focused on several government investigations. By the time the case was tried, the investigations had either closed without consequence or remained pending. Yet the plaintiff continues to insist that it has sufficient evidence to show a credible basis from which the court could suspect wrongdoing, based largely on two events post-dating its demand. It points to a lawsuit in the District of Columbia that was later dismissed and a fine levied by an Italian regulator with no obvious connection to the plaintiff's stated purpose. As to tax compliance, the plaintiff relied on a single assessment of unpaid state taxes from more than five years ago.

1

This evidence falls short of the threshold that a plaintiff must meet to justify a further investigation of corporate documents. But the plaintiff cannot prevail for another, simpler reason: the demand was satisfied. Amazon produced all necessary and essential documents related to the alleged wrongdoing discussed in the demand. The plaintiff's request for eleven years' worth of additional documents falling within nineteen different categories amounts to a fishing expedition and lacks the precision our law requires.

Judgment will be entered for Amazon.

## I.     FACTUAL BACKGROUND

This case was tried on a paper record consisting of 78 exhibits. The following facts have been proven by a preponderance of the evidence, drawn from the admitted allegations in the pleadings and stipulated facts in the pre-trial order, or are not subject to reasonable dispute.[1]

### A.     Amazon's Growth

Amazon.com, Inc. is a Delaware corporation with its principal corporate offices in Seattle, Washington.[2] The company was founded in 1994 as an online bookseller by Jeff Bezos, who served as its Chief Executive Officer until 2021.

---

[1] Where facts are drawn from exhibits jointly submitted by the parties at trial, they are referred to according to the numbers provided on the parties' joint exhibit list (cited as "JX __") unless otherwise defined.

[2] Pre-Trial Order ("PTO") ¶ 1 (Dkt. 50).

Today it is a technology company with roughly $470 billion in annual sales and products and services ranging from Amazon Marketplace (a platform for third parties to sell products online) to Amazon Web Services (a cloud computing platform).[3]

As Amazon has grown, it has been a frequent focus of news articles and advocacy group pieces highlighting its market power. For example, in 2012, the *Wall Street Journal* reported that "[a]ccording to some small retailers," Amazon was using Amazon Marketplace to "spot new products to sell, test sales of potential new goods, and exert more control over pricing."[4] In 2016, a *ProPublica* article stated that Amazon "appear[ed] to be using its market power and proprietary algorithm to advantage itself at the expense of sellers and many customers."[5] And in 2017, a group called the Institute for Local Self Reliance published a report entitled "Amazon's Stranglehold: How the Company's Tightening Grip is Stifling Competition, Eroding Jobs, and Threatening Communities."[6]

**B.    The Government Investigations**

Amazon has also been the subject of certain governmental investigations that are relevant to this litigation.

---

[3] Amazon, Inc., Annual Report (Form 10-K), at 23 (Feb. 4, 2022); *see* Dkt. 16 at 7-8.

[4] JX 1.

[5] JX 6.

[6] JX 7.

On June 3, 2019, the Subcommittee on Antitrust, Commercial and Administrative Law of the Judiciary Committee of the United States House of Representatives announced that it would undertake an "investigation into competition in digital markets" and examine the conduct of "dominant firms."[7] In October 2020, the Subcommittee completed its investigation and issued a report. The report explained that the Subcommittee had completed a "top-to-bottom review of the market," examining the "dominance of Amazon" and others and reviewing "existing antitrust laws, competition policies, and current enforcement levels to assess whether they are adequate to address market power and anticompetitive conduct in digital markets."[8] The report set out extensive policy recommendations.[9] It did not find that Amazon violated any antitrust laws.

On July 17, 2019, the European Commission—the European Union's executive body—announced that it was opening an investigation to "assess whether Amazon's use of sensitive data from independent retailers who sell on its marketplace is in breach of EU competition rules."[10] The announcement stated that "[i]f proven, the practices under investigation may breach EU competition rules on anticompetitive agreements between companies . . . and/or on the abuse of a

---

[7] JX 21 at 1.

[8] JX 49 at 6.

[9] *Id.* at 375-404.

[10] JX 23 at 1.

4

dominant position." It further noted that "[t]he opening of a formal investigation does not prejudge its outcome."[11]

On July 23, 2019, the Department of Justice ("DOJ") announced that it was "reviewing whether and how market-leading online platforms have achieved market power and are engaging in practices that have reduced competition, stifled innovation, or otherwise harmed consumers."[12] The press reported that the announcement was "widely interpreted" to mean that Amazon was among the targets of the investigation.[13] News articles indicated that the Federal Trade Commission ("FTC") was also investigating whether major technology companies—including Amazon—had violated antitrust laws.[14]

Following an April 23, 2020 *Wall Street Journal* article stating that "Amazon.com Inc. employees have used data about independent sellers on the company's platform to develop competing products, a practice at odds with the company's stated policies,"[15] a United States Senator wrote to the Attorney General to request that the DOJ open a "criminal antitrust investigation of Amazon."[16]

---

[11] *Id.* at 2.

[12] JX 26.

[13] JX 27.

[14] *Id.*

[15] JX 33.

[16] JX 34.

Members of the House Judiciary Committee—their investigation still, at that point, ongoing—also asked Bezos to testify before the Committee.[17] The press quoted one of the letter's signatories as saying that the *Wall Street Journal* report—if true—"raise[d] deep concerns about Amazon's apparent lack of candor before the [Judiciary] Committee [in previous testimony]."[18]

### C. The South Carolina Tax Dispute

Separately, a South Carolina tax proceeding is relevant to this litigation.

On June 21, 2017, the South Carolina Department of Revenue determined that Amazon Services, LLC (an Amazon subsidiary) owed roughly $12.5 million in taxes, penalties, and interest for failing to collect and remit state sales and use tax on certain sales by third parties on Amazon Marketplace between January 1 and March 31, 2016.[19] Amazon filed a Request for Contested Case Hearing and the South Carolina Administrative Law Court held a hearing on the merits in February 2019. The court entered a final order affirming the South Carolina Department of Revenue's decision on September 10, 2019.[20]

---

[17] JX 35.

[18] JX 36.

[19] JX 28 at 1.

[20] *Id.*

**D. The Books and Records Demand and Document Production**

On June 5, 2020, plaintiff and Amazon stockholder Oklahoma Firefighters Pension and Retirement System sent Amazon a demand pursuant to 8 *Del. C.* § 220 to inspect the company's books and records.[21] The demand set forth three purported purposes for the inspection:

> (a) investigating corporate waste, mismanagement, or wrongdoing and breach of fiduciary duties of loyalty, good faith, and care on the part of Amazon's officers and directors . . .
>
> (b) taking appropriate action in the event the members of the Company's Management and Board did not properly discharge their fiduciary duties, including the preparation and filing of a stockholder derivative lawsuit, if appropriate; and
>
> (c) determining whether the current Board can independently and disinterestedly evaluate a litigation demand or other stockholder action or recommendation.[22]

Regarding the first stated purpose, the plaintiff explained that it sought "to investigate credible evidence" that Amazon's officers and directors "knowingly participated in or otherwise approved misconduct that would constitute a breach of fiduciary duties" by:

> engaging in or allowing the company to engage in (1) anti-competitive conduct in potential violation of the Sherman Antitrust Act of 1890, Clayton Antitrust Act of 1914, Federal Trade Commission Act of 1914, and other

---

[21] JX 39 ("Demand Letter").

[22] *Id.* at 17.

7

applicable federal and state antitrust laws; and (2) unlawful tax avoidance strategies or improper influence of state officials to garner favorable tax treatment that gave Amazon an unfair competitive advantage.[23]

The demand sought nineteen categories of documents. Fourteen categories included requests for various "Board Materials," defined to include Amazon Board and Board committee meeting minutes and "all Board books, reports, handouts, and other materials provided to members of the Amazon Board, or any subcommittees thereof."[24] Another category (with several subcategories) sought documents "pertaining to director independence of directors on Amazon's Board."[25] The remaining categories included relevant corporate policies and procedures, interview files concerning any relevant internal investigations, and documents "produced to any state agency or attorney general" pertaining to tax payment or collections.[26] All documents were sought "[f]or the period of January 1, 2011 to the present."[27]

Amazon responded to the demand by letter on July 9, 2020.[28] It asserted that the demand failed to establish a proper purpose for inspection because it did not set

---

[23] *Id.* at 1-2.

[24] *Id.* at 17-19.

[25] *Id.* at 19.

[26] *Id.* at 18.

[27] *Id.* at 17.

[28] JX 40.

8

forth a credible basis to infer wrongdoing or mismanagement by Amazon's officers or directors.[29]  Amazon also wrote that the categories of documents sought were overbroad and that the plaintiff had not demonstrated the requested materials were necessary to achieve its stated purposes.[30]  Nonetheless, Amazon said it was "willing to discuss potentially producing to [the plaintiff] a targeted set of materials responsive to its demand," subject to the execution of an appropriate confidentiality agreement and proof of ownership of Amazon stock.[31]  The plaintiff and Amazon executed a confidentiality agreement in November 2020.[32]

On December 4, 2020, Amazon produced its first set of documents to the plaintiff.  Amazon described the category of produced documents to the plaintiff as:

> [F]or the period from January 1, 2019 to June 30, 2020, minutes and agendas for, and materials distributed or presented at, board or committee meetings that relate to the investigations into potential anticompetitive conduct by Amazon by the House of Representatives' Antitrust Subcommittee of the Judiciary Committee, the FTC, the DOJ, and the European Commission, referenced at pp. 6-9 of the inspection demand letter . . . .[33]

---

[29] *Id.* at 2.

[30] *Id.* at 2-3.

[31] *Id.* at 3.  The demand was accompanied by a declaration refencing "attached transaction reports" as evidence of the plaintiff's beneficial ownership of Amazon stock, but no such reports were attached.  Demand Letter at 20; *see* JX 40 at 2.

[32] JX 51.

[33] JX 53 at 5; JX 57 at 34-35.

Information deemed outside of that category was redacted and labeled as non-responsive.[34]

On December 11, 2020, the parties' counsel discussed the production. Amazon's counsel confirmed that its December 4 production had included all responsive documents within the described category.[35] The plaintiff requested that Amazon produce additional documents relating to alleged anticompetitive conduct against third-party merchants using Amazon's online sales platform and to alleged violations of tax laws.[36]

Amazon made a supplemental production on March 20, 2021. That production was described by Amazon to the plaintiff as falling into three categories:

> Minutes and agendas for, and materials distributed or presented at, board or committee meetings that relate to Amazon's use of seller data for products sold by third parties on the Amazon Marketplace in the United States and the European Union, including internal controls and risk assessment procedures relating to such use, for the date range October 1, 2015 to June 30, 2020.
>
> Minutes and agendas for, and materials distributed or presented at, board or committee meetings that relate to the investigations into potential anticompetitive conduct by Amazon by the House of Representatives' Antitrust Subcommittee of the Judiciary Committee, the FTC, the DOJ, and the European Commission, referenced at pp. 6-9 of the inspection demand letter sent on behalf of [the

---

[34] *See, e.g.*, JX 77.

[35] JX 53 at 1-2.

[36] *Id.*

10

plaintiff], for the date range October 1, 2015 to December 31, 2018. Together with the documents that the Company ha[d] already made available for inspection, the documents provided in this category would span the date range October 1, 2015 to June 30, 2020.

Minutes and agendas for, and materials distributed or presented at, board or committee meetings from January 1, 2019 to June 30, 2020, relating to Amazon's compliance with state sales tax laws.[37]

Once again, information outside of those categories was redacted and labeled as "Redacted – Non-Responsive."[38]

In total, Amazon produced 729 pages of board-level materials to the plaintiff, with non-responsive material redacted.[39]  The plaintiff did not engage in further discussions with Amazon about the production or ask Amazon to produce additional documents.

### E.    Events Following the Demand

Two events that occurred after the demand was served (and after Amazon had produced two sets of documents) were a focus at trial.

---

[37] JX 54 at 2; *see* JX 57 at 35-36.

[38] *See, e.g.*, JX 2.

[39] PTO ¶ 7.

11

First, in May 2021, a lawsuit was filed by the Attorney General for the District of Columbia against Amazon for alleged violations of the District of Columbia Antitrust Act (the "D.C. Litigation").[40]

Second, on December 9, 2021 (after this litigation was filed), the *Wall Street Journal* reported that Italy's antitrust regulator had fined Amazon €1.13 billion for "favoring third-party sellers that use the company's logistics services" in Italy.[41] The article noted that Amazon called the fine "unjustified and disproportionate" and that the company would appeal. "In the Italian legal system," the article explained, "if the first court confirms the fine and remedies, the company can appeal again to a higher court" and the "court can also decide to reduce the fine."[42]

### F. This Litigation

On June 3, 2021, the plaintiff filed its Verified Complaint pursuant to 8 *Del. C.* § 220.[43] The parties submitted a stipulated scheduling order to govern the

---

[40] *District of Columbia v. Amazon.com, Inc.*, 2021-C.A.-001775-B (D.C. Super. Ct.); JX 67 ¶ 97; *see* Dkt 56.

[41] JX 74.

[42] *Id.*

[43] PTO ¶ 8.

proceedings, allowing for limited discovery.[44] A trial on a paper record was held on February 14, 2022.[45]

Each party made an additional submission after trial. On April 1, 2022, Amazon's counsel informed the court that the D.C. Litigation had been dismissed.[46] On April 7, 2022, the plaintiff's counsel informed the court of an April 6 *Wall Street Journal* article reporting that the Securities and Exchange Commission ("SEC") "[wa]s probing how [Amazon] . . . handled disclosures of its employees' use data from sellers on its e-commerce platform."[47]

## II.   LEGAL ANALYSIS

Section 220 of the Delaware General Corporation Law provides stockholders of Delaware corporations with a qualified right to inspect corporate books and records.[48] A stockholder seeking to inspect a corporation's books and records must comply with Section 220's form and manner requirements and state a proper purpose.[49] "After meeting those requirements, the plaintiff must demonstrate by a

---

[44] Dkt. 15. Though the plaintiff had filed a motion to expedite, it did not press that motion and requested a trial date in early 2022. *See* Dkt. 13 at 4-5.

[45] Dkt. 54.

[46] Dkt. 56.

[47] Dkt. 57.

[48] *See Swift v. Houston Wire & Cable Co.*, 2021 WL 5763903, at *3-4 (Del. Ch. Dec. 3, 2021) (describing stockholders' "qualified inspection right[s]").

[49] *See* 8 *Del. C.* § 220(b)-(c).

13

preponderance of the evidence that 'each category of books and records is essential to accomplishment of the stockholder's articulated purpose for the inspection.'"[50]

There are two disputed issues in this case.[51] First, whether the plaintiff has substantiated a proper purpose for inspection. And second, assuming that the plaintiff has stated a proper purpose, whether records beyond those already produced by Amazon are needed to accomplish it.

### A.    Whether the Plaintiff Has Demonstrated a Proper Purpose

Section 220 defines a "proper purpose" for inspection as one "reasonably related to such person's interests as a stockholder."[52] The plaintiff's demand identifies three purposes: (1) to investigate possible mismanagement (regarding antitrust laws and tax laws); (2) to take action in the event that Amazon's directors and officers have violated their fiduciary duties; and (3) to assess the independence and disinterestedness of Amazon's directors.[53] These purposes have been consistently recognized as proper under Delaware law.[54]

---

[50] *Lebanon Cnty. Empls.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752, at *6 (Del. Ch. Jan. 13, 2020) (quoting *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996)), *aff'd*, 243 A.3d 417 (Del. 2020).

[51] Amazon does not dispute that the plaintiff's Section 220 demand satisfied the statute's form and manner requirements.

[52] 8 *Del. C.* § 220(b).

[53] Demand Letter at 17.

[54] *See Seinfeld v. Verizon Commc'ns*, 909 A.2d 117, 121 (Del. Ch. 2006) ("It is well established that a stockholder's desire to investigate wrongdoing or mismanagement is a 'proper purpose.'"); *KT4 P'rs LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 758 (Del. 2019)

Because the second purported purpose depends on whether the stockholder's purpose of investigating potential wrongdoing is proper, this opinion does not discuss it further. I address only the stated purposes of investigating possible mismanagement and assessing director independence and disinterestedness.

### 1. Investigating Possible Mismanagement

Although investigating possible mismanagement is a proper purpose, "a bare allegation of possible waste, mismanagement, of breach of fiduciary duty, without more, will not entitle a stockholder to a Section 220 inspection."[55] "[A] stockholder seeking to investigate wrongdoing must show, by a preponderance of the evidence, a credible basis from which the court can infer there is 'possible mismanagement as would warrant further investigation.'"[56]

---

("One of the most traditional proper purposes for a § 220 demand is the investigation of possible wrongdoing by management."); *In re Facebook, Inc. Section 220 Litig.*, 2019 WL 2320842, at *16 (Del. Ch. May 30, 2019), *as revised* (May 31, 2019) ("It is well settled that the desire to investigate director independence is a proper purpose, particularly in instances where the stockholder seeks to investigate whether demand upon the board to pursue claims on behalf of the company would be futile."); *AmerisourceBergen*, 2020 WL 132752, at *7 (listing proper purposes, including "to investigate allegedly improper transactions or mismanagement" and "to obtain particularized facts needed to adequately allege demand futility after the corporation has admitted engaging in backdating stock options").

[55] *AmerisourceBergen*, 243 A.3d at 426.

[56] *Id.* (quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568 (Del. 1997)).

15

The "credible basis" standard of proof is the lowest recognized under Delaware law. But it is not inconsequential.[57] A stockholder must provide "*some evidence of wrongdoing*" that would warrant further investigation.[58] A stockholder need not "prove mismanagement actually occurred, but must make 'a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing.'"[59]

The plaintiff argues that it has proffered sufficient evidence of possible mismanagement by Amazon's fiduciaries relating to violations of antitrust and tax laws. That evidence primarily concerns certain government investigations and litigation. "Ongoing investigations and lawsuits can provide the necessary evidentiary basis to suspect wrongdoing or mismanagement warranting further investigation."[60] That is especially so when "governmental agencies or arms of law enforcement" are involved.[61]

---

[57] *Id.* (describing the credible basis standard as "not an insubstantial threshold").

[58] *High River Ltd. P'ship v. Occidental Petroleum Corp.*, 2019 WL 6040285, at *5 (Del. Ch. Nov. 14, 2019); *see Seinfeld*, 909 A.2d at 119 ("The issue before us is quite narrow: should a stockholder seeking inspection under [S]ection 220 be entitled to relief without being required to show some evidence to suggest a credible basis for wrongdoing? We conclude that the answer must be no.").

[59] *Norfolk Cnty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*, 2009 WL 353746, at *6 (Del. Ch. Feb. 12, 2009) (quoting *Sec. First Corp.*, 687 A.2d at 568).

[60] *AmerisourceBergen*, 2020 WL 132752, at *9 & n.5 (collecting cases).

[61] *Id.* at *9 & n.6 (collecting cases).

Delaware law does not—as the plaintiff suggests—provide that evidence of open inquiries and lawsuits alone necessarily begets a credible basis from which the court can infer possible mismanagement. In *Louisiana Municipal Police Employees' Retirement System v. Lennar Corp.*, for instance, the court held that evidence of eight lawsuits that were settled without any admission of wrongdoing and news reports describing an investigation by the United States Department of Labor, state-level regulators, and the IRS had "negligible" probative value.[62] Rather than provide a "reportorial suggestion, based on investigation, that Lennar [wa]s engaged in wrongdoing" justifying inspection, the evidence "presented only a chain of inferences that never amount[ed] to more than speculation" and did not satisfy the credible basis standard.[63]

This approach is consistent with the goal of "maintain[ing] a proper balance between the rights of shareholders to obtain information based upon credible allegations of corporation mismanagement and the rights of directors to manage the business of the corporation without undue interference from stockholders" reflected in Section 220 jurisprudence.[64] The very purpose of an investigation is to discover

---

[62] 2012 WL 4760881, at *1, *4-5 (Del. Ch. Oct. 5, 2012).

[63] *Id.* at *4.

[64] *Seinfeld*, 909 A.2d at 122; *see Lennar*, 2012 WL 4760881, at *3 ("This requirement strikes an appropriate balance between encouraging productive Section 220 actions where there is a reasonable likelihood of wrongdoing while preventing inspections without a factual basis from draining corporate resources.").

whether there is evidence of non-compliance.  And a lawsuit can be filed on the basis

of bare or conclusory allegations.  If every government inquiry or lawsuit was

sufficient evidence to satisfy the credible basis test, stockholders would effectively

be relieved of their burden of "show[ing] *some evidence* of possible wrongdoing."[65]

Accordingly, Delaware courts have routinely looked to some additional

evidence beyond ongoing inquiries or litigation to find that a plaintiff has met its

burden.[66]  In several recent decisions, the scale of investigations and lawsuits, the

---

[65] *Id.* at 123.

[66] *See, e.g.*, *In re UnitedHealth Gp., Inc. Section 220 Litig.*, 2018 WL 1110849, at *7 (Del. Ch. Feb. 28, 2018) (finding the credible basis standard met where evidence of possible wrongdoing included a *qui tam* complaint that relied on extensive evidence derived from a five-year DOJ investigation); *Gross v. Biogen Inc.*, 2021 WL 1399282, at *3, *9 (Del. Ch. Apr. 14, 2021) (holding that the combination of a settlement with a United States Attorney and detailed allegations in multiple government subpoenas provided sufficient evidence of possible wrongdoing to warrant further investigation); *In re Plains All Am. Pipeline, L.P.*, 2017 WL 6016570, at *3-4 (Del. Ch. Aug. 8, 2017) (finding a credible basis based on the indictment of the defendant on four felony counts following a pipeline rupture, an investigation, and evidence that Plains' pipelines suffered incidents at three times the rate of the national average); *Okla. Firefighters Pension & Ret. Sys. v. Citigroup Inc.*, 2015 WL 1884453, at *6-7 (Del. Ch. Apr. 24, 2015) (finding a credible basis of wrongdoing from subpoenas that were "not merely the consequence of Citigroup's being caught up in the dragnet of a federal investigation" but rather "issued shortly after Citigroup entered [into related] Consent Orders, which arose from findings by the OCC, the FDIC, and the Federal Reserve"); *Carapico v. Phila. Stock Exch., Inc.*, 791 A.2d 787, 792 (Del. Ch. 2000) (finding the credible basis standard met where, among other things, an inquiry by the SEC resulted in the imposition of sanctions and limitations on the company's business practices); *Jacob v. Bloom Energy Corp.*, 2021 WL 733438, at *6-8 & n.87 (Del. Ch. Feb. 25, 2021) (finding the credible basis standard met by "firm" evidence including a short report relying on detailed "publicly available and vetted information along with litigation filings," expert testimony, and interviews with business clients ); *Elow v. Express Scripts Hldg. Co.*, 2017 WL 2352151, at *5-6 (Del. Ch. May 31, 2017) (looking to admissions and contentions in a plenary lawsuit and contradictory public statements made by company management to establish a credible basis), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214

severity or results of those inquiries, and corporate trauma provided the necessary indication of potential wrongdoing to support stockholders' parallel books and records investigations.

In *Lebanon County Employees' Retirement Fund v. AmerisourceBergen Corporation*, the evidence of possible mismanagement included subpoenas from the United States Drug Enforcement Administration and numerous United States Attorneys' Offices, investigations launched by 41 state attorneys, and a morass of litigation including a multidistrict litigation that "centralize[d] 1,548 different lawsuits brought by state attorneys general, cities, counties, Native American tribes, union benefit funds, and other plaintiffs."[67] At the time of the Section 220 trial, certain government investigations had closed and resulted in findings of widespread violations.[68] The company also suffered "significant corporate trauma" as evidenced by an offer to settle the state attorneys general's claims for $10 billion (which was countered at $45 billion) and AmerisourceBergen spending over $1 billion in

---

A.3d 933 (Del. 2019); *Freund v. Lucent Techs.*, 2003 WL 139766, at *1, *3 (Del. Ch. Jan. 9, 2003) (finding that "a substantial restatement" of revenues, a resulting formal investigation by the SEC, and a series of pending civil suits following a "precipitous decline" in the value of the company's stock provided a credible basis for inferring possible waste or mismanagement); *Saito v. McKesson HBOC, Inc.*, 2001 WL 818173, at *3-4 (Del. Ch. July 10, 2001) (finding a credible basis to suspect wrongdoing based a restatement of financial statements that led to public admissions of accounting irregularities, eight high level executives being terminated or resigning, and the institution of criminal proceedings by federal authorities), *aff'd in part, rev'd on other grounds*, 806 A.2d 113 (Del. 2002).

[67] *AmerisourceBergen*, 2020 WL 132752, at *3, *5, *10-11.

[68] *Id.* at *1.

defending and settling related litigation.[69]  The court explained that the significant corporate trauma demonstrated that the plaintiffs were not engaging in an "indiscriminate fishing expedition" and granted an inspection of AmerisourceBergen's books and records.[70]

In *Pettry v. Gilead Sciences, Inc.*, the court found that the credible basis standard was met where a stockholder sought to investigate potential mismanagement related to alleged anticompetitive activity, mass torts, patent infringement, and violations of the False Claim Act.[71]  The wrongdoing "appear[ed] vast" and included: a pending antitrust class action that survived a motion to dismiss, "at least 250 tort actions" including one class action with more than 15,000 plaintiffs, a patent infringement suit brought by the United States government following evidence of widespread patent infringement, multiple government investigations, and a pending *qui tam* action in which "detailed information" supported allegations of numerous violations of the False Claims Act.[72]

And in *In re Facebook Section 220 Litigation*, the court found that the evidence supported a credible basis to infer possible wrongdoing where "multiple regulatory authorities opened investigations into Facebook's data privacy lapses"

---

[69] *Id.* at *5, *11.

[70] *Id.* at *11.

[71] 2020 WL 6870461, at *12 (Del. Ch. Nov. 24, 2020).

[72] *Id.* at *6, *12-14, *24.

and numerous related lawsuits—consumer class actions, government enforcement actions, and derivative actions—had been filed.[73] The court also gave weight to a government report that cited "emails, meeting minutes, witness interviews and other evidence" relevant to the alleged wrongdoing, to a potential multibillion dollar fine by the FTC, and to detailed reports in the press of a Facebook board meeting connected to the alleged wrongdoing.[74]

> a. Evidence of Possible Mismanagement Regarding Antitrust Compliance

Here, the evidence of potential malfeasance regarding alleged anticompetitive conduct lacks the sort of "plus factor" found in *AmerisourceBergen*, *Gilead*, *Facebook*, and other cases where ongoing government investigations and lawsuits contributed to the satisfaction of the credible basis standard.[75] The investigations into Amazon's antitrust compliance have little probative value. The Congressional Subcommittee investigation closed in 2020 with no finding of an antitrust violation by Amazon.[76] The DOJ and FTC investigations are evidenced solely by news

---

[73] 2019 WL 2320842, at *1, *8.

[74] *Id.* at *13, *15.

[75] *See, e.g.*, *Biogen*, 2021 WL 1399282, at *9 ("Just as the government investigation plus the *qui tam* litigation established a credible basis in *Gilead*, the government investigation plus the TAF Settlement demonstrate a credible basis to suspect possible mismanagement here.").

[76] *See generally* JX 49. The plaintiff points out that the Subcommittee's report stated that "Amazon displayed a lack of candor to the Subcommittee in response to questions about

articles, which report on the existence of the investigations but lack any credible suggestion that Amazon has engaged in wrongdoing.[77] The recently reported SEC investigation is not evidence supporting an inference of possible misconduct for similar reasons.[78] The European Commission's investigation concerns whether Amazon breached E.U. competition rules—not the domestic laws that are the express focus of the demand[79]—and no evidence of an adverse outcome was presented.

The additional news articles introduced by the plaintiff do not tip the scales. Many of those articles are stale, having been published years before the plaintiff made its Section 220 demand.[80] The more recent pieces, such as the April 2020 *Wall Street Journal* article, are also insufficient. The demand states that the *Wall Street Journal* article caused members of Congress to question whether aspects of Amazon's testimony and written responses were false or misleading.[81] But no

---

its business practices." *Id.* at 253. That statement does not, however, have anything to do with the purported wrongdoing the plaintiff wishes to investigate.

[77] *See, e.g.*, JX 22.

[78] *See Lennar*, 2012 WL 4760881, at *4 (holding that articles discussing the mere existence of investigations rather than "wrongdoing by companies under investigation" did not amount to meaningful evidence).

[79] *See* Demand Letter at 1; *see infra* at 24-25, note 89.

[80] *See* JXs 1, 6, 7.

[81] Demand Letter at 8-9.

22

evidence was proffered that those purported concerns led to civil or criminal proceedings against Amazon.[82]

The D.C. Litigation also adds little. Neither the demand nor the plaintiff's complaint in this action mentions the D.C. Litigation. It was raised for the first time in pre-trial briefing. Even if it was fairly raised, the D.C. Attorney General's complaint was not based on "substantial evidence" (as the plaintiff asserts)[83] but cites to investigations and articles similar to those described above.[84] It is nothing, for example, like the complaint in a *qui tam* action relied on to establish a credible basis in *In re UnitedHealth Group, Inc. Section 220 Litigation.*[85] That complaint cited to an extensive factual record developed over a five-year DOJ investigation that included the depositions of twenty UnitedHealth employees and the production of over 600,000 documents.[86] In any event, the D.C. Litigation has been dismissed.[87]

---

[82] *See Lennar*, 2012 WL 4760881, at *4; *La. Mun. Police Empls.' Ret. Sys. v. Countrywide Fin. Corp.,* 2007 WL 4373116, at *2 (Del. Ch. Dec. 6, 2007) (granting a Section 220 inspection based not only on a news article but also on an expert's testimony and analysis of the article's methodology).

[83] Pl.'s Pre-Trial Br. 12 (Dkt. 39).

[84] *See, e.g.*, JX 67 ¶¶ 22-23 (discussing "antitrust scrutiny" from regulators and comments by a U.S. senator).

[85] 2018 WL 1110849, at *7.

[86] *Id.*

[87] Dkt. 56. As Chancellor Chandler said in *Graulich v. Dell Inc.*, despite the credible basis standard being "interpreted as a low one," the presence of past lawsuits against a company "does not cut it." 2011 WL 1843813, at *5 n. 49 (Del. Ch. May 16, 2011).

That leaves the €1.13 billion fine levied by Italy's antitrust regulator. The fine is not insubstantial. In the abstract, it comes closest to the sort of evidence that our court has found supportive of an inference of possible wrongdoing where a plaintiff relies on investigations or litigation to substantiate its purpose. Unsurprisingly, the plaintiff mentioned the fine repeatedly at trial. But it was neither raised in the demand nor timely introduced in this litigation; the fine was assessed well after discovery closed.

Critically, the plaintiff has made no showing that the Italian fine is linked to the purported violations of antitrust law it seeks to investigate.[88] The demand letter explains that the plaintiff's purpose is to investigate whether Amazon's directors and officers breached their fiduciary duties with regard to violations of domestic antitrust laws—specifically, "the Sherman Antitrust Act of 1890, Clayton Antitrust Act of 1914, Federal Trade Commission Act of 1914, and other applicable federal and state

---

[88] The demand letter described the European Commission investigation as concerning alleged antitrust violations related to Amazon using its "access to competitively sensitive information about competitors' products . . . to boost its own retail activities at the expense of third part sellers on its marketplace." Demand Letter at 7. Indeed, this form of alleged conduct is the central focus of the plaintiff's demand. *E.g.*, *id.* at 5 (discussing reporting of "specific instances where Amazon appeared to be using third-party data to launch competing products"). The evidence indicates that the Italian investigation, by contrast, addressed a different kind of anticompetitive conduct (a type of tying) whereby Amazon allegedly "favor[ed] third-party sellers that use[d] the company's logistics services." JX 74.

24

antitrust laws."[89]  It does not list investigating breaches of fiduciary duty in connection with Italian antitrust law violations as a purpose of the demand.  The plaintiff cannot broaden the scope of its Section 220 demand at this late stage.[90]  If the plaintiff wished to investigate potential wrongdoing related to violations of Italian law, it should have served a demand making that explicit.

Taken together, the evidence falls below the level established in this court's prior decisions to warrant further investigation.  The government investigations have either closed without consequence or are pending.  The negative news articles

---

[89] Demand Letter at 1.  The plaintiff argues that the demand letter, its "communications" with Amazon, and the complaint demonstrate that it requests documents related to "international" antitrust investigations.  *See* Pl.'s Answering Pre-Trial Br. 8 (Dkt. 43).  For example, the demand describes the European Commission's investigation into anticompetitive conduct and requests documents related to inquiries by "federal, state, and international regulators."  Demand Letter at 7-8, 17.  But the demand states that the plaintiff's purpose is focused on possible violations of domestic antitrust laws.  In addition, the cited materials lack any reference to Italian regulators in particular.  Amazon—which operates around the globe—would not have been on notice that the plaintiff intended to investigate possible violations of Italian antitrust laws based on a vague request for documents about actions taken by "international regulators."  *Id.*

[90] *See Beatrice Corwin Living Irrevocable Tr. v. Pfizer, Inc.*, 2016 WL 4548101, at *7 (Del. Ch. Sept. 1, 2016) (explaining that the "plaintiffs' creeping expansion of their reasons for investigating mismanagement or wrongdoing are inconsistent with Delaware law and unfair to [the corporation]"; noting that this court generally "has declined to read into a demand possible purposes for the inspection other than those specifically identified in the demand"); *see also Fuchs Fam. Tr. v. Parker Drilling Co.*, 2015 WL 1036106, at *4 (Del. Ch. Mar. 4, 2015) ("[The defendant's] right to consider [the plaintiff's] demand properly would be substantially impaired by forcing it to adapt its response and defense to [the plaintiff's] evolving requests."); *Paraflon Invs., Ltd. v. Linkable Networks, Inc.*, 2020 WL 1655947, at *6 (Del. Ch. Apr. 3, 2020) ("A corporate board is entitled to be informed of exactly what the stockholder is demanding to inspect so it can make the call, before litigation, whether to allow inspection or litigate the demand.").

provide little substantive information beyond disclosing the existence of government investigations. The D.C. Litigation has been dismissed. And although a substantial fine could provide the sort of plus factor needed where the plaintiff's suspicions are based on government investigations and litigation without adverse outcomes, the fine concerns Italian law—which is extraneous to the plaintiff's stated purpose.

### b. Evidence of Possible Mismanagement Regarding Tax Compliance

The evidence presented regarding Amazon's alleged "unlawful tax avoidance strategies" or efforts to "garner favorable tax treatment" is likewise deficient.[91] Compared to the arguments raised about purported antitrust law violations, those concerning tax laws appear to be an afterthought. The plaintiff largely cites to its own demand letter and complaint to support its contentions.[92] That does nothing to substantiate the plaintiff's burden of proof—it is not evidence.

The only evidence presented is the South Carolina Administrative Law Court's Final Order regarding the $12.5 million assessment against Amazon by the South Carolina Department of Revenue.[93] That court found that Amazon was obligated under the South Carolina law in effect in 2016 to collect and remit sales and use taxes on certain third-party transactions. Since 2016, South Carolina has

---

[91] Demand Letter at 1-2.

[92] *See* Pl.'s Pre-Trial Br. 14; Pl.'s Answering Pre-Trial Br. 11-12.

[93] JX 28.

passed legislation expressly imposing tax collection obligations on marketplace facilitators.[94] A tax dispute from over five years ago—under one state's (since-revised) law and for a relatively immaterial amount—is hardly credible evidence of possible wrongdoing that could support a broad investigation into Amazon's compliance with tax laws.[95]

### 2. Assessing the Board's Independence and Disinterestedness

The plaintiff's other stated purpose is to determine whether Amazon's directors can "independently or disinterestedly" assess a litigation demand or other stockholder-requested action.[96]

Although this purpose is proper, a stockholder is not entitled to documents concerning director independence simply because it asks. Curiosity is an insufficient reason to grant stockholders access to documents—particularly those that might include personal information about topics such as a director's finances or family. A plaintiff must give the court credible grounds to justify an inspection.[97]

---

[94] S.B. 214, Gen. Assemb., 123d Sess. (S.C. 2019); *see* JX 28 at 18 n.24; JX 77 at 663.

[95] *See Lennar*, 2012 WL 47660881, at *5 (declining to give weight to suggestions "only that misconduct could have occurred in the past"); *see also Se. Pa. Transp. Auth. v. AbbVie, Inc.*, 2015 WL 1753033, at *1 (denying inspection where a plaintiff sought to investigate potential mismanagement relating to corporate taxes because the evidence showed "only that the directors took a risky decision that failed at substantial cost to the stockholders"), *aff'd*, 132 A.3d 1 (Del. 2016) (TABLE), *overruled on other grounds by AmerisourceBergen*, 243 A.3d 417 (Del. 2020).

[96] Demand Letter at 17.

[97] *See Hoeller v. Tempur Sealy Int'l, Inc.*, 2019 WL 551318, at *9 (Del. Ch. Feb. 12, 2019) (denying inspection of "information regarding board interest or conflicts" where "nothing

In some cases, plaintiffs have made that showing by alleging a wrongful refusal of a pre-suit demand.[98] That is not the situation presented in this action.

In other cases, plaintiffs have been granted access to documents bearing on demand futility where a credible basis to infer wrongdoing that might cast doubt on the directors' impartiality was established or the "evidence provide[d] a reasonable basis to question the board's independence."[99] Here, however, the plaintiff proffered no such evidence.[100]

---

[the plaintiff] presented . . . provide[d] a credible basis to suspect that [company] fiduciaries were conflicted" on the subject of the demand).

[98] *See Grimes v. DSC Commc'ns Corp.*, 724 A.2d 561, 566 (Del. Ch. 1998) (granting access to documents to investigate whether a special committee "acted independently and with due care" where the company rejected a pre-suit demand "without explanation"); *La. Mun. Police Empls. Ret. Sys. v. Morgan Stanley & Co. Inc.*, 2011 WL 773316, at *7 (Del. Ch. Mar. 4, 2011) ("Basic notions of accountability require that stockholders be able to use Section 220 to evaluate whether the demand-refusal decision was made in good faith, after a reasonable investigation, 'or whether the Board had some different, ulterior motivation.'" (quoting *City of Westland Police & Fire Ret. Sys. v. Axcelis Techs., Inc.*, 1 A.3d 281, 291 (Del. 2010))).

[99] *See Haywood v. Ambase Corp.*, 2005 WL 2130614, at *5-6 (Del. Ch. Aug. 22, 2005) (finding that a board committee's granting of discretionary bonuses when criteria for awarding bonuses were not met, as well as the CEO's compensation being well beyond the range of comparable companies, provided a basis for inspecting documents concerning the board's independence); *Paul v. China MediaExpress Hldgs., Inc.*, 2012 WL 28818, at *5 (Del. Ch. Jan. 5, 2012) (holding that a stockholder was entitled to investigate demand futility where he set forth a credible basis upon which to infer waste and mismanagement might have occurred); *La. Mun. Police Empls.' Ret. Sys. v. Hershey Co.*, 2013 WL 6120439, at *7 n.58 (Del. Ch. Nov. 8, 2013) ("[The plaintiff's] third stated purpose, to investigate the independence and disinterestedness of [the company's] directors to determine if demand would be excused as futile, only would be proper if [the plaintiff] had established a credible basis to investigate mismanagement or wrongdoing that ultimately could form the basis of a derivative suit.").

[100] At trial, the plaintiff's counsel argued that the plaintiff is entitled to materials about Amazon directors' independence because Bezos was "intimately involved" in growing the

28

\*　　　\*　　　\*

At bottom, the evidence presented is more speculative than reliable and falls short of what our law requires.  But I need not hold that the plaintiff's claim turns solely on whether it stated a proper purpose.  Amazon—met with a facially valid Section 220 demand and allegations of wrongdoing—took the lessons of our case law to heart.  It did not reject the demand out of hand, place unreasonable conditions on inspection, or raise a panoply of merits-based defenses.[101]  Instead, Amazon attempted to avoid litigation by producing the core, formal board materials that generally satisfy a company's obligations under Section 220.  As discussed below, Amazon's production ultimately proves fatal to the plaintiff's demand for a broader inspection.

## B.    Whether the Additional Documents Sought are Necessary and Essential

Irrespective of whether it stated a proper purpose, the plaintiff is not entitled to the inspection it requests.  It failed to satisfy its burden "to show that the specific

---

company and the plaintiff wishes to determine whether the board's judgment "has been unduly influenced" by him.  Trial Tr. Feb. 4, 2022 at 22.  But, again, the plaintiff makes no allegations in its demand or complaint—much less presents evidence—that legitimately call into question the directors' independence.

[101] *E.g.*, *AmerisourceBergen*, 243 A.3d at 437 (noting that Section 220 proceedings are not the time to assess the merits of a plaintiff's potential plenary claims); *Gilead*, 2020 WL 6870461, at *2 (questioning "overly aggressive defense strateg[ies]" in response to Section 220 demands).

29

books and records [it] seeks to inspect are 'essential to [the] accomplishment of the stockholder's articulated purpose for the inspection.'"[102]

Amazon produced three categories of board minutes and materials relating to the demand's allegations of potential violations of antitrust and state tax laws. Specifically, it produced "minutes and agendas for, and materials distributed or presented at, board or committee meetings" for a nearly five-year time period relating to the government investigations referenced in the demand and to Amazon's allegedly anticompetitive use of seller data.[103]  And it produced the same sort of materials for an eighteen-month period relating to compliance with state sales tax laws.[104]

Formal board-level documents are often the beginning and end of a Section 220 production where a plaintiff aims to investigate whether directors exercised

---

[102] *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 371 (Del. 2011) (quoting *Leviton Mfg. Co.*, 681 A.2d at 1035); *see id.* at 372 (explaining that where the corporation has already provided records for inspection to the stockholder, the stockholder "bears the burden of proving that the information [in the records sought] is essential to [its] purpose, taking into account the books and records [the company] has previously furnished"); *see also Jos. A. Bank Clothiers*, 2009 WL 353746, at *10 (stating that a stockholder who has already received documents "that should suffice for [its] purpose" must "articulate a reasonable need for whatever additional documents it seeks" and "could have studied the documents . . . to show how th[o]se documents [we]re insufficient or how other documents [we]re necessary").

[103] JX 54 at 2; *see* JX 53 at 5; JX 57 at 35-36.

[104] JX 54 at 2.

proper oversight.[105] Those materials allow a stockholder "to assess the extent to which Board members were made aware of the alleged wrongdoing and to evaluate how the Board members responded [to any] [i]nvestigation[s]."[106]

The plaintiff has not introduced evidence indicating that atypical circumstances necessitating a broader inspection are present. For example, the record belies any notion that Amazon did not "honor traditional corporate formalities" or that "traditional materials, such as board resolutions or minutes" are wanting.[107] Minutes and materials from sixteen Audit Committee meetings were produced. Nor is this a case where the plaintiff cited "evidence of wide-ranging

---

[105] *See, e.g.*, *Palantir*, 203 A.3d at 752-53 (cautioning that "the Court of Chancery should not order emails to be produced when other materials (e.g., traditional board-level materials, such as minutes) would accomplish the petitioner's proper purpose"); *id.* at 756 (explaining that companies are not "presumptively required to produce emails and other electronic communications"); *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 790 (Del. Ch. 2016) (recognizing that "[t]he starting point—and often the ending point—for a sufficient inspection will be board level documents evidencing the directors' decisions and deliberations, as well as the materials that the directors received and considered"), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019); *Detectives' Endowment Ass'n v. McDonald's Corp.*, C.A. No. 2021-0673-JRS, at 27 (Del. Ch. Nov. 29, 2021) (TRANSCRIPT) ("*Palantir* and its progeny establish that, generally, a plaintiff is entitled to board-level documents and nothing more.").

[106] *Biogen*, 2021 WL 1399282, at *15.

[107] *Palantir*, 203 A.3d at 742 (finding that the plaintiff was entitled to a production of email because it presented evidence that the defendant "had acted through email in connection with the alleged wrongdoing that [the plaintiff] was seeking to investigate").

31

mismanagement" providing grounds for an inspection of investigation-related documents not reviewed by the board.[108]

Rather than identify discrete categories of information beyond Amazon's production that it needed to satisfy its stated purpose (to the extent it would have been entitled to any additional production), the plaintiff chose to overreach. It insists that *all* of the documents sought in the nineteen categories listed in the demand— across an eleven-year time period—be produced in unredacted form. Many of the categories, as stated, concern Amazon's business practices and are untethered to issues of antitrust compliance or regulatory inquiries.[109] Another seeks "[a]ny"

---

[108] *Freund*, 2003 WL 139766, at *5; *see Gilead*, 2020 WL 6870461, at *1, *24 (observing that the alleged "wrongdoing appears vast" and plaintiffs had established "a credible basis to suspect that Gilead violated antitrust laws, committed mass torts, infringed on government patents, and defrauded government programs"). In *Lucent* and *Gilead*, the extreme facts led the court to order the inspection of high-level, formal communications with regulators. *Lucent*, 2003 WL 139766, at *5 (permitting inspection of "[o]rders and other communications with the SEC concerning its investigation"); *Gilead*, 2020 WL 6870461, at *26 (permitting inspection of "high-level communications" with investigators that "state the basis for the ongoing government investigations"). The plaintiff's submissions at trial make clear that it seeks materials well beyond that, including any documents Amazon produced to regulators. It is difficult to imagine why the plaintiff would be entitled to a reproduction of the documents Amazon produced in response to government subpoenas or investigations. *See Palantir*, 203 A.3d at 755 (noting that Section 220 contemplates the production of a "discrete set of books and records" that is "much less extensive than would likely be produced in discovery under the standards of Rule 26 in a plenary suit"); *Saito*, 806 A.2d at 114 ("[Section 220] does not open the door to the wide ranging discovery that would be available in support of litigation").

[109] See categories 5-6 and 8-10 of the plaintiff's demand letter, for example. Demand Letter at 18.

32

documents produced to a state agency "regarding tax payments and collections."[110]

That is far from the rifled precision that Delaware law requires.[111]

The plaintiff also lacks grounds to challenge Amazon's redactions for non-responsiveness. The plaintiff is correct that, in the civil discovery context, this court has expressed disfavor of responsiveness redactions—particularly to board minutes and materials.[112] But such redactions in the Section 220 context are a different matter entirely. In my view, redactions to material unrelated to the subject matter of a demand are proper because Section 220 only entitles a stockholder to information essential to accomplishing its stated purposes for inspection. The redactions appropriately cabin Section 220 inspections to their intended scope.[113] Board and

---

[110] *Id.*

[111] *Ferris v. Ferris Props., Inc*., 2020 WL 6606062, at *2 (Del. Ch. Nov. 12, 2020) ("[T]he scope of the inspection should be circumscribed with precision . . . .").

[112] *See, e.g.*, *Flax v. Pet360, Inc.,* C.A. No. 10123-VCL, at 54-55 (Del. Ch. June 29, 2015) (TRANSCRIPT); *Medicalgorithmics S.A. v. AMI Monitoring, Inc.,* C.A. No. 10948-CB, at 97 (Del. Ch. July 15, 2015) (TRANSCRIPT). The plaintiff also argues that Amazon was required to produce a redaction log. The two cases on which it relies concern logging redactions for privilege, not relevance. *See Mudrick Cap. Mgmt., L.P. v. Globalstar, Inc*., 2018 WL 3625680, at *11 (Del. Ch. July 30, 2018); *Yahoo!*, 132 A.3d at 796.

[113] *See Detectives' Endowment Ass'n*, C.A. No. 2021-0673-JRS, at 11-12 (TRANSCRIPT) (declining to order an additional production where the defendant had redacted irrelevant categories of information, and explaining that the redacted information was shown to be "[a]t best . . . helpful in arguing that the board failed to properly oversee discrimination and harassment"); *In re Plains All Am. Pipeline*, 2017 WL 6016570, at *1 (ordering a Section 220 production that allowed the defendant to redact non-responsive information); *Jos. A. Bank Clothiers*, 2009 WL 353746, at *6 ("Even if a plaintiff demonstrates a proper purpose, that plaintiff is not entitled to inspect all the documents that he or she believes are relevant or even likely to lead to information relevant to that purpose.").

committee meetings often address a range of topics, which are reflected in minutes and materials. A stockholder who establishes a proper purpose to investigate one subject discussed during a meeting does not obtain license to review all others.

Finally, the plaintiff's insistence that Amazon produce documents spanning a more than eleven-year timeframe is vastly overbroad. This court has found shorter time periods to exceed the bounds of Section 220.[114] Here, the government actions that form the crux of the demand started in 2019. Amazon produced core corporate records that sufficiently cover the matters raised in the demand across a relevant multi-year time period.[115]

## III. CONCLUSION

For the reasons described above, the plaintiff is not entitled to a further inspection of the Amazon books and records requested in its Section 220 demand. Judgment will be entered for the defendant.

---

[114] *See, e.g.*, *In re Facebook*, 2019 WL 2320842, at *19 ("Plaintiff's [2018] demand for documents dating back to 2011 is too broad for a Section 220 inspection."); *Sutherland v. Dardanelle Timber Co.*, 2006 WL 1451531, at *10 (Del. Ch. May 16, 2006) (limiting the time frame for inspection to one year where the plaintiff had sought seven years' worth of documents).

[115] *See Carapico*, 791 A.2d at 793 (reducing the time period for an inspection related to an SEC investigation from four years to two years because the shorter period "sufficiently cover[ed] the SEC inquiry and its aftermath").